[No. 7765.—In Bank.]

## PEOPLE v. W. H. PARKS.

DRAINAGE ACT—CONSTITUTIONAL LAW—TITLE OF ACT.—The act of April 23, 1880, entitled "an act to promote drainage," contravenes article iv, section 24, of the Constitution, requiring that every act shall embrace but one subject, which shall be expressed in its title.

ID.—ID.—ID.—The words "other operations," occurring in the clause in said act providing for the control of debris from mining and other operations, may conceal many subjects not expressed in the title, and renders it obnoxious to the constitutional provision.

ID.—ID.—DEBRIS.—The storage of debris and the promotion of the drainage of a district of country are things essentially different. The former is in its nature a private enterprise, while the drainage of a State is a public purpose.

ID.—ID.—LEGISLATIVE POWER.—The Legislature has no power to impose taxes for the benefit of individuals connected with a private enterprise,

even though the private enterprise might benefit the local public in a remote or collateral way.

ID.—ID.—ID.—The said act is further unconstitutional in that it does not designate the locality where drainage is necessary, nor establish the boundaries of any drainage district, but delegates this duty to a board.

ID.—ID.—ID.—The legislature has no power to create a board composed of executive officers of the State and delegate to it legislative duties.

ID.—ID.—ID.—TAXATION.—The said act is further unconstitutional in that it authorizes a local board to levy a tax and two assessments for a public purpose at the same time on the same property, in addition to a tax levied by the State for the same purpose on all the property of the State, while none of the taxes are levied for a local purpose.

ID.—ID.—ID.—MYRICK, J., concurring, was of opinion, that the act was not obnoxious to article iv, section 24, of the constitution.

ID.—ID.—ID.—CASE DISTINGUISHED.—*People* v. *Boggs,* 56 Cal. 648.

ID.—ID.—ID.—CONSTRUCTION OF STATUTE.—MCKINSTRY, J., concurring, was of opinion that the distribution of an act into sections is purely artificial. The real point always is, whether the provisions are essentially and inseparably connected in substance.

ID.—ID.—ID.—ID.—It a well-settled rule that when a portion of an act is constitutional, and another is unconstitutional, if the two are so inseparably blended together as to make it clear that either clause would not have been enacted without the other, the whole act must fall.

ID.—ID.—ID.—The said act is unconstitutional in that it creates no relation between the taxes to be levied within any district which the state board may choose to establish, and the benefits received by such district.

ID.—ID.—ID.—SHARPSTEIN, J., dissenting, was of opinion that the act was not so clearly unconstitutional as to authorize the court to oust from office a director of a drainage district, or to enjoin the letting of contracts under the act, or to adjudge that one of said drainage districts was illegally formed.

ID.—ID.—ID.—PARTY IN INTEREST.—And he was further of the opinion that the people of the State can not be heard to object to the levying of a tax within a drainage district.

APPEAL from a judgment for the defendants in the Superior Court, Sacramento County, DENSON, J.

The action was brought to oust the defendants from the office of member of the board of directors of drainage district number one; to enjoin them letting any contracts as such board, and from levying any tax within said district; and to obtain a decree determining that said district was not legally formed, and was not a drainage district.

*James A. Waymire* and *J. H. Dickinson,* for Appellants.

1. The title is misleading; the subject sought to be pro-

vided for by the act is not embraced in the title, and the act embraces subjects not expressed in the title. The title is, "An Act to Promote Drainage." Were the act, in view of its purposes, properly entitled, the title would be: "An act to provide for the impounding of debris, and for the improvement and rectification of river channels in which debris flows, and to levy and collect taxes to pay the cost of the same." (Const., art. iv, § 24.)

Formerly this provision of the Constitution was construed to be directory. (*Washington* v. *Page*, 4 Cal. 388; *Pierpont* v. *Cranch*, 10 id. 316.) It is now mandatory. (Const., art. i, § 22; *Alleghany Co., Howes' Case*, 77 Pa. St. 77; *People* v. *Supervisors of Chatauqua*, 43 N. Y. 10; *State* v. *County Judge*, 2 Iowa, 280; *People* v. *Devohy*, 20 Mich. 350; *Rader* v. *Township of Union*, 39 N. J. 514; *Walker* v. *The State*, 49 Ala. 329; *City of St. Louis* v. *Tiefel*, 42 Mo. 591.)

2. The act is local, because its entire operations are confined to "the construction of dams for impounding debris from the mines," "and for the improvement and rectification of river channels in which said debris flows." (Proviso to § 24.)

3. The Legislature can not delegate its powers, except as expressly authorized in the Constitution. This necessarily results from the nature of representative government; for, if the Legislature could transfer its authority in one instance, it might in all others, and it could thus change the nature of the government entirely. Our Constitution has left nothing to be implied in this respect; it has distinctly asserted the principle. (Const., art. iii; *Houghton* v. *Austin*, 47 Cal. 653; *Ex parte Wall*, 48 Cal. 280.)

This Court has frequently held that a local legislative body can not authorize an executive officer to make improvements upon a street "where necessary," even though the particular street and the character of the work be designated. (*Richardson* v. *Heydenfeldt*, 46 Cal. 68; *People* v. *Clark*, 47 id. 456; *People* v. *Ladd*, id. 603; *Brady* v. *King*, 53 id. 44.)

Any act which attempts to substitute the judgment and discretion of any person for the judgment and discretion of the Legislature in a matter committed to the Legislature, and not expressly authorized by the Constitution to be delegated, is void.

The very first sentence of the act is fatal to the whole of it. "The Governor, Surveyor, and State Engineer shall be the *ex officio* members of, and constitute a Board of Drainage Commissioners to divide the State into several drainage districts, and organize the same as hereinafter provided." Here is a wholesale delegation of general legislative powers to executive officers—the power of organizing districts in which taxes are to be levied, fixing boundaries, etc.

We contend that the "Drainage Act" is clearly open to this objection in the following particulars:

1. It substitutes the judgment of an executive officer as to what territory should be drained. It provides (§ 2) that the State Engineer shall "make special examinations with reference to the divisions of the State into several drainage districts, each of which shall include a territory drained by one natural system of drainage, and shall report to the Board of Drainage Commissioners the result of his examinations, and shall from time to time propose boundaries for such districts, and recommend their formation." This report is not to be made to the Legislature, as it should be if at all, so that the judgment of the Legislature could act upon it, using it simply as it uses all other information gathered through other State officials, or its committees. We do not say that that could not be done. The report is to be made to a "Board of Drainage Commissioners"—the Governor, Surveyor-General, and the State Engineer—all of whom are executive officers, forbidden to exercise any legislative or judicial powers. The only limit placed upon the engineer, in selecting the drainage territory, is that it must be "drained by one natural system of drainage." The Sacramento and all its tributaries may, in his judgment, be so drained, or the Bear River may be, or the Yuba, or any one of their numerous tributaries. Whether there shall be one district or a hundred the Legislature does not undertake to say; that is left entirely to the judgment of the engineer and the commissioners. Each district is to have three salaried directors appointed by the Governor. (§ 4.) Whether there shall be three, or three hundred, or three thousand, is not determined by the legislative judgment. The legislative judgment does not even attempt to say what rivers are to be included; whether the Los Angeles, the Salinas, the

San Joaquin, the Russian, or the Sacramento. The engineer may include any one or all of them, or only a part of one of them.

What is a "natural system of drainage"? The act does not inform us. That is left to the engineer, just as the Board of Supervisors undertook to shirk their duty by describing the street work to be done, in *Richardson* v. *Heydenfeldt*, 46 Cal. 69, "constructing sidewalks on Broadway Street, from the westerly line of Van Ness Avenue to the easterly line of Octavia Street, where necessary." This last description was much more specific, yet it was insufficient. If a Street Superintendent can not be allowed to judge as to where work on a street is "necessary," how can the State Engineer be permitted to exercise his judgment as to where drainage is "necessary"?

At the argument counsel contended that this was simply making use of the engineer as an expert to "find" the drainage district. Is he any more of an expert in drainage than a Street Superintendent is as to his specialty? If the argument is good for anything, it will enable the Legislature to substitute the "wisdom" of experts for their own in other matters as well as this. Irrigation is quite as difficult a subject, and it may need an expert to point out irrigation districts. So, also, with swamp land districts. And if with these, why not with towns, cities, and counties? And if experts must be had with reference to boundaries of districts and public corporations, why not with reference to all other matters requiring special knowledge?

Law is a science. The average member of the Legislature is not and can not be an educated lawyer. He knows little about practice and pleadings. Shall he be allowed to get a substitute to make the laws for him on those subjects? And why not, if on anything? Is it possible that he is wise enough to frame a Code of Civil Procedure, or to make laws relative to contracts, lands, trustees, corporations—all the complicated affairs of life, even for the government of cities and counties—and yet is incapable of acting upon this one subject of drainage? The proposition is too absurd to be considered. The members of the Legislature come from all parts of the State; they are presumed to know the wants of every section

of it. If there is any local matter which they feel unable or unwilling to act upon, they are expressly authorized by the Constitution to commit it to the local legislative authorities. But where it involves the creation of a public corporation or district for the reclamation, irrigation, drainage, or other improvements of private property, they can not authorize an executive officer to act for them. Heretofore it has been the invariable practice of the Legislature either to fix the boundaries of such districts directly, or to delegate the power to the local legislatures, as in forming swamp land districts. Even the Legislature of 1880 understood this fully. (Stat. 1880, pp. 52, 55, 62.)

In all the States where there are general laws for the formation of municipal corporations, the laws always provide that the boundaries shall be fixed by legislative authority—generally by the local legislative body, acting upon the recommendation of the inhabitants concerned. The law of Ohio is a good illustration. (See R. S. Ohio, ed. of 1880, p. 496.)

2. It substitutes the judgment of executive officers as to the expediency of a law. The act (§ 2) provides that "after the State Engineer has reported the boundaries and recommended the formation of one or more drainage districts, the board shall proceed to consider the same, and may adopt, amend, or reject said report; but if adopted by them, either in its original form or as amended, they shall, by resolution entered upon the record of their proceedings, declare the said territory to be, and the same shall thereupon become a drainage district." There is nothing here that makes the district, as reported by the engineer, a drainage district. His report is not sufficient. It must be acted upon by the board. It is their action that creates the district. Until they act there is no district, and if they never act upon any district the law is inoperative. No work will be done under it. No district, or water, or swamp land tax, can be collected, and if the State tax should be collected its proceeds could not be expended. The purpose of the act—the drainage of lands—can not be accomplished until the board declare the district to be formed. Thus it is for the board to breathe the breath of life into the law. They give it force and effect. They make the law. Now, a careful examination of the statute will fail to show

anything whatever that requires the board to declare a district formed. The language is not mandatory anywhere, but expressly permissive—directory. They may adopt, amend, or reject the report, and if they do so, then they shall declare the district formed. Whether they shall adopt it entire, without amendment, or amend it in part, or reject it altogether, is left to their judgment. They may reject the report entirely, and thus decline to form the proposed district, but they can not form a district without a report as a basis. They may refuse to act upon it at all. There is nothing in the statute that requires them to do anything. The word may can not be construed to mean shall, for that is precluded by the subsequent use of the word if, in the same sentence, showing clearly the intent of the Legislature to leave the expediency of forming a district entirely to the judgment of the commissioners.

3. It substitutes the judgment of executive officers as to when and where taxes shall be levied. The act provides, as we have seen, that the board may create drainage districts. When? "After the State Engineer has reported." That is all. It may be a month, or a year, or ten years after. And the engineer may propose districts "from time to time." Districts may be formed at such times and in such places as the engineer and the commissioners may deem expedient. The districts may embrace such persons and such property as, in their judgment, may seem proper. After a district has been created, a tax of one twentieth of one per cent. "upon all the property of the district" must be levied in October of each year. (§ 16.) The tax may be levied after the time provided by law for making assessments. (§ 17.) An "assessment upon all hydraulic mines and upon all mines washing earth or ores with water running into the district, of one half of one per cent. for each miner's inch of water of each twenty-four hours' run," is to be levied; also (§ 20) swamp lands in the district benefited by the work are to be assessed. (§§ 21–23.) None of these taxes or assessments are to be levied outside of a drainage district. Whether they shall be demanded of any taxpayer does not depend upon any act of the Legislature. The representatives "to whose judgment, wisdom, and patriotism" the power of taxation is committed

by the Constitution have attempted to substitute other "agencies" for determining the amount of taxes to be exacted from the people. The "agencies" may create as many tax districts as they judge "necessary;" may create them "where necessary," according to their judgment; and they may create them or any one of them when they deem it expedient. Thus these executive officers have full power over the people to levy taxes upon them at will. Their discretion is as unrestricted as that of the Legislature, except as to the amount of the tax.

This is not only shocking to the natural sense of liberty, but it is contrary to the settled policy of this State, and of all the other States. The vast bodies of swamp lands in Arkansas, Mississippi, Louisiana, Ohio, and in other States, have been reclaimed by local districts, taxing according to benefits; organized upon petition of the inhabitants immediately concerned by the legislative act of the local legislative body, carefully prescribing boundaries, and controlled by trustees or directors elected by themselves. This is the plan adopted in this State in 1868, and since adhered to with reference to swamp lands. (Political Code, § 3446 *et seq.*) It has been applied to irrigation districts. (Stats., 1877–78, p. 820.) A recent act applies it to the protection of lands from overflow, the very purpose indicated by the title to the "drainage" act. (Stats. 1880, p. 55.) Relative to this swamp-land system, Mr. Justice Crockett, in *Hagar* v. *Supt. of Yolo County*, 47 Cal. 235, makes some pertinent remarks. See also *Doyle* v. *Austin*, 47 Cal. 35 ; *People* v. *Lynch*, 51 id. 30 ; Cooley on Taxation, 104–123.

*Sears & Baker*, also for Appellant.

The Legislature is prohibited from passing local or special laws, for the laying out of roads, for the collection of taxes, for extending the time for the collection of taxes, for creating offices, or prescribing their duties in counties, or affecting the fees of any officer. The act in question is local and special with regard to the districts, and it authorizes the laying out of roads, provides for the collection of taxes, authorizes the extension of time for collection of certain taxes, creates offices, and prescribes their duties in counties, and it affects the fees of officers. The proviso to section 24 makes

the act special in the extreme. It limits the expenditure of money to the "construction of dams for impounding debris from mines hereinbefore specified," and for the improvement of rivers in which such debris flows. The act is unconstitutional, because it is a special appropriation bill and contains more than one item. The subjects of the act are not expressed in it. (*Morgan* v. *Ritz,* 50 Md. 579 ; *Lockport* v. *Gaylord,* 61 Ill. 276.) It delegates legislative power.

*John Reynolds,* also for Appellant.

The act provides for the formation of districts in which the streams are affected by debris other than that from mining operations, yet all the money raised in the district is to be expended in impounding mining debris. The tax is thus unequal. The Legislature has determined what amount shall be raised each year for the purposes of the act, but has left it dependent on the action of the assessors and boards of equalization,

*I. S. Belcher, W. T. Wallace, S. M. Wilson, W. C. Belcher,* and *J. K. Byrne,* for Respondents.

The first point of attack upon the law, is the title. A provision like that in our own is found·in the constitutions of several other States, and many cases have arisen in which the courts have declared the true construction and interpretation to be given to this inhibition. (*State* v. *Town of Union,* 33 N. J. Law, 350 ; *Rader* v. *Town of Union,* 39 id. 509 ; *Walker* v. *Caldwell,* 4 La. An. 297 ; *Police Jury of Pointe Coupée* v. *Colomb,* 20 id. 197 ; *People* v. *Briggs,* 50 N. Y. 553–558 ; *Sun Mutual Ins. Co.* v. *Mayor etc. of N. Y.,* 8 id. 253 ; *In re Fedinand Mayer,* 50 id. 504–506 ; *People* v. *Mahaney,* 13 Mich. 495 ; *The State* v. *County Judge,* 2 Iowa, 282 ; *Parkinson* v. *State,* 14 Md. 184, 193, 196 ; *Purcott* v. *Chicago,* 60 Ill. 121; *State* v. *Silver,* 9 Nev. 227 ; *People* v. *Lawrence,* 36 Barb. 177, 189, 192 ; *Miles* v. *The State,* 40 Ala. 39–41 ; *White* v. *City of Lincoln,* 5 Neb. 505–514 ; *People ex rel. Klokke* v. *Wright,* 70 Ill. 389, 396, 397 ; *Allegheny Co. Home's Appeal,* 77 Pa. St. 77 ; *Louisville etc.* v. *Ballard,* 2 Metc. Ky. 165–168 ; *Robinson* v. *The State,* 15 Tex. 311 ; *Bright* v. *McCullough,* 27 Ind. 223 ; *Allen* v. *Tison,* 50 Ga. 374 ; *Evans* v.

*Sharp,* 29 Wis. 264; *Ream* v. *Siskiyou,* 36 Cal. 620–622; Cooley's Const. Lim., p. 141.)

The appellant claims that the act creates corporations for municipal purposes by special law. We answer, that if the districts are public corporations, they are not municipal corporations within the meaning of the Constitution. The phrase "municipal corporations," as used in this section of the Constitution, means exactly what Judge Dillon, in his work on Municipal Corporations, defines it to be; where he says it "has reference to incorporated villages, towns, and cities, with power of local administration, as distinguished from other public corporations, such as counties and *quasi* corporations." (Dillon on Munic. Corp., § 22.) This also clearly appears from the section itself. It reads:

Section 6. " Corporations for municipal purposes shall not be created by special laws; but the Legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns," etc.

It is argued that the act is unconstitutional in that it is local and special and provides for a tax. We reply that the Constitution does not mean to take away the power to impose local taxes, but only to provide that when imposed there shall be no distinction between different localities as to the *procedure* by which, or the *times* at which such taxes are to be collected. This prohibition undoubtedly refers to the habit into which the Legislature had fallen, of postponing the collection of taxes in some sections of the State.

The act is not a local or special law, but is general in the same sense that the acts for the reclamation of swamp and overflowed lands and the formation of reclamation districts for that purpose are general laws. The Drainage Act embraces within its provisions all portions of the State in which water is used for mining, or which are in any way affected by the prosecution of that industry.

The constitutional prohibition against local or special laws, in relation to taxation, is evidently applicable only to taxes for general revenue; and it was intended to require that for such taxation the rule as to the time and manner, and the subjects of assessment, and the exemptions and deductions to be allowed, and as to the time and manner and conditions of

collection, should be uniform throughout the State, but was not intended to apply to assessments or taxes required to pay for such public works as the Legislature, in the exercise of its police power, might judge to be necessary. Such works are uniformly more or less local. They are public because they affect and interest the entire people—they are local because situate in a particular locality, and in many cases because of the peculiar benefit to the locality where situate.

In the exercise of this power the State may cut down forests, or cause them to be cut down, and drain swamps and salt marshes, or cause them to be drained, against the will of the owners, and at their expense, in whole or in part. (*The New Orleans Draining Co.,* 11 La. An. 338; *Yeatman* v. *Crandall,* id. 120; *Williams* v. *Cammack,* 27 Miss. 209; *Egyptian Levee Co.* v. *Hardin,* 27 Mo. 495; *McGee* v. *Mathis,* 21 Ark. 40; *State* v. *Newark,* 27 N. J. Law, 194; *Tide Water Co.* v. *Coster,* 18 N. J. Eq. 518; *Dingley* v. *Boston,* 100 Mass. 544; *Hagar* v. *Supervisors of Yolo County,* 47 Cal. 233.)

The Legislature, by this drainage act, did not transfer, or attempt to transfer, or delegate to the Board of Drainage Commissioners, any legislative function whatever.

The act is complete in itself, and is an expression of the legislative will. "The policy, wisdom, and justice" of the law were decided by the Legislature, and that body left nothing to be decided or considered by any other person, board, or tribunal.

In this respect it differs entirely from the act considered in the case of *Ex parte Wall,* 48 Cal. 279, which was held to be invalid "because it did not become a law when it left the hands of the Legislature, but was to take effect only when it should be approved by the majority of the people of a township."

Under the Drainage Act, all that was left to be done was to carry the legislative will, as declared in the act, into execution.

The act defines the boundaries of the districts by providing that each district should embrace all the territory drained by one river system or natural system of drainage, and that upon the determination by inspection or survey of the boundaries of each water-shed on the surface, by the executive

officers named for that purpose, that territory should be and become a drainage district.        .

In the formation of these districts nothing was left to the judgment or discretion of the Board of Drainage Commissioners; they had only the executive duty of determining, by inspection or survey, the boundaries of the natural drainage systems into which by the act the State is divided. Their office and duties are purely ministerial. (*People* v. *Boggs*, 56 Cal. 648.)

McKEE, J.:

The question presented for consideration in this case involves the constitutionality of an act of the Legislature entitled, "An Act to Promote Drainage," passed April 23d, 1880. It is contended that the act is unconstitutional and void, and is no law, because it contravenes section 24 of article iv, of the Constitution, which requires that every act shall embrace but one subject, which shall be expressed in its title.

In the consideration of such a question, it is a cardinal rule that nothing but a clear violation of the Constitution will justify a Court in overruling the legislative will. Every statute is presumed to be constitutional, and every intendment is in favor of its validity. (*Bourland* v. *Hildreth*, 26 Cal. 161.) When a statute is challenged as in conflict with the fundamental law, a clear and substantial conflict must be found to exist to justify its condemnation; but when found, Courts must not hesitate to condemn. The Constitution is the voice of the people speaking in their sovereign capacity, and it must be heeded. When it speaks in plain language with reference to a particular matter, it must have effect as the paramount law of the land. (*Matter of N. Y. E. R. Co.*, 70 N. Y. 342; *Warner* v. *Beers*, 23 Wend. 166; *People* v. *Albertson*, 55 N. Y. 54.)

1. According to the constitutional requirement for the enactment of statutory law, the title of every bill introduced into the Legislature must denote the subject of legislation; and when the legislative will on that subject has assumed the form of law, its provisions must correspond with the subject, of which the title is the name, standing for and representing it.

The title of the act under consideration fairly indicates but one subject. As expressed in the title the whole object of legislation is " to promote drainage." Any one, after reading the title, would naturally expect to find in the body of the act, provisions for carrying that into effect as the whole object of the law; because such provisions, in view of the constitutional provision referred to, would be necessary to give unity and wholeness to the law. Provisions of an act may be numerous; but however numerous, if they can be, by fair intendment, considered as falling within the subject-matter of legislation, or necessary as ends and means to the attainment of the subject, the act will not conflict with the Constitution. But if the act shall be found to be made of incongruous parts, or to comprehend unconnected and dissimilar subjects to that expressed in its title, it can not be upheld. Under such circumstances, the title would not be a fair indication of the measures enacted, nor would the act itself be an honest expression of the legislative will, according to the forms of the Constitution. There would be wanting that unity of title and subject necessary to a constitutional law.

Looking beyond the title to the provisions embodied in the act under consideration, it will be found that they embrace more than one subject; and the question is, whether all of them fall within, or any one of them falls without, the subject expressed in the title.

By section 1, a Board of Drainage Commissioners is appointed to divide the State into several drainage districts and to establish the boundaries thereof (§ 3), and to organize each district (§§ 1–3), for the purpose of carrying into effect the following objects, viz: "The control of debris from mining and other operations; the improvement and rectification of river channels; and the erection of embankments or dykes necessary for the protection of lands, towns, or cities, from inundation." (§ 2.)

Of the board thus established, the Governor of the State was appointed President, and to him, as Governor, was given power to appoint, within ten days after the organization of any drainage district, three persons residents of the district, to act as a Board of Directors for the district, each of whom was to receive a salary of one hundred dollars per month,

and to hold office for four years, and until his successor was appointed and qualified. (§§ 4, 5.) To each of such Boards of Directors, after it had organized by the election of a President, and each of its members had taken the oath of office, and given bond according to the provisions of section 4, power was given to appoint a Secretary and a District or Resident Engineer, and to fix their salaries (§§ 5, 13); to determine upon, with the aid of the State Engineer, a system or plan of works to be constructed in its district (§§ 7, 8); to agree upon and adopt plans and specifications for such works (§ 8); to award contracts for the construction of the same, upon the basis that no Chinese or Mongolians shall be directly or indirectly employed on them (§ 9); to take from any citizen within the district who might consent to the same, and, if his consent could not be obtained, to purchase from him any material necessary for the construction of any of the works; and to appropriate any lands which might be considered necessary for the right of way for any of the works for the drainage of the district, or "on which to construct reservoirs for storing debris from the mines, whether the same be within or without the boundaries of the district." (§ 11.) And, whenever acquisition of the right of way, or of material needed for the construction of levees, or reservoirs for the storage of debris, or of lands for the construction and completion of the system or plan of works adopted, could not be had from the owners, the board was authorized to institute proceedings, in the name of the district, for the condemnation of such right of way, material, and lands, under the provisions of the Code of Civil Procedure regulating the exercise of the power of eminent domain. (§ 12.) And, to defray official salaries, and the cost and expenses incurred in the scheme of improvements for each district, each board was empowered to raise money, in exercise of the powers of assessment and taxation, by levying a tax upon all the property of the district to the extent of one twentieth of one per cent. on the value of the taxable property therein, and an assessment upon all the hydraulic mines, and all mines washing earth or ores with water, of one half of one per cent. for each miner's inch of water of each twenty-four hours' run used during the year; and upon all swamp and overflowed lands in the

district to the extent of not exceeding three dollars per acre. (§§ 15–23.) In addition to which, provision was made in the act for the levying of a State tax, in the year 1880, and each year thereafter, of one twentieth of one per cent. on all the taxable property in the State. (§ 24.) All these assessments and taxes were made collectible and payable as State and county taxes. But the moneys thus raised were to be used "exclusively for the construction of dams for impounding the debris from the mines hereinbefore specified, and for the improvement and rectification of river channels, in which said debris flows within the drainage district to be formed under the provisions of this act, at such points thereof as shall be designated by the State Engineer, or deemed necessary by the Board of Directors of such drainage district." (§ 24.)

It will thus be seen that the body and scope of the act include a combination of subjects. The construction of reservoirs for the storage of debris from mines, the protection of lands, towns, or cities from inundation by the erection of embankments or dykes, the drainage of certain districts of the State by the rectification of river channels, and the levy of special taxes to carry on a system of public works, are all inseparably conjoined in the body of the act. The extraordinary powers conferred upon the District Board of Directors are to be exercised for the benefit of all the subjects conjointly; and the money to be raised by the exercise of these powers is to be expended for all without distinction as to any particular ones, thus rendering it impossible to disjoin the subjects embraced in the act, which are not expressed in its title, from the subject expressed in the title, so as to adjudge the one void and the other valid, as might be done under section 24, of article iv, of the Constitution.

Nor are all the subjects of the act such as would naturally fall within the subject of its title. The storage of debris, "from mining and other operations," seems to be the paramount object of the act, to promote drainage the subordinate. What the phrase "other operations" may mean is not clear from the act itself. Under it may be concealed many subjects which are not expressed in the title; and the existence of such a phrase in a statute renders it obnoxious to the con-

stitutional provision under consideration. But the storage of debris, and the promotion of the drainage of a district of country, are things essentially different. The one has no necessary connection with the other. To drain land is to rid it of its superfluous moisture. This is generally done by deepening, straightening, or embanking the natural water-courses which run through it, and by supplementing them when necessary by artificial ditches and canals; but it is not within the art of the drainer to promote drainage by building reservoirs for the storage of debris from " mining and other operations," unless the word is to be wrenched from its geological or ordinary signification and meaning, and changed so as to mean water, at any mining or other locality where debris may have accumulated.

Besides, the storage of debris is, in its nature, a private enterprise in which the few only are interested. The drainage of a State is a public purpose in which the public may be interested. To promote a public purpose by a tax levy upon the property in the State, is within the power of the Legislature; but the Legislature has no power to impose taxes for the benefit of individuals connected with a private enterprise, even though the private enterprise might benefit the local public in a remote or collateral way. Legislative power of taxation is not illimitable. It can be used only in aid of a public object—an object which is within the purpose for which governments are established. In the vigorous language of the Supreme Court of Pennsylvania, " the Legislature has no constitutional right to levy a tax, or to authorize any municipal corporation to do it, in order to raise funds for a mere private purpose. No such authority passed to the Assemby by the general grant of the legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation and becomes plunder." (*Sharpless* v. *Mayor etc.*, 21 Penn. 168.)

At the least, then, two heterogeneous subjects are embraced in the act, one of which is not expressed in the title, and they can not be segregated. The title does not express the objects of legislation embodied in the provisions of the act. It

is, therefore, narrower than the body of the act, and fails to impart that notice of the measures enacted, which the Constitution requires.   To prohibit such legislation was the sole end and aim of the constitutional requirement.   "The practice," says the Supreme Court of Missouri, "of comprising in one bill subjects of a diverse and antagonistic nature, in order to combine in its support members who were in favor of particular measures, but neither of which could command the requisite majority on its own merits, was found to be not a corruptive influence in the Legislature itself, but destructive of the best interests of the State.   But this was not more detrimental than that other pernicious practice, by which, through dexterous and unscrupulous management, designing men inserted clauses in the bodies of bills, of the true meaning of which the titles gave no indication, and by skillful maneuvering urged them on to their passage.   These things led to fraud and injury, and it was found necessary to apply a corrective in the shape of a constitutional provision." (*City of St. Louis* v. *Tiefel*, 42 Mo. 590.)   This provision has been framed in the constitutions of many of the States of the Union; and Courts, whenever it has come before them, have liberally construed it as the will of the people in the interests of honest legislation.

In the *People* v. *Denahy*, 20 Mich. 350, Mr. Justice Cooley, in considering a statute which provided for the expenditure of non-resident highway taxes, for the improvement of two State roads, and for the construction and improvement of another State road, which was not expressed in the title, uses this language : " These objects have no necessary connection, and being grouped together in one bill, legislators are not ·only precluded from expressing, by their votes, their opinion upon each separately, but they are so united as to invite a combination of interests among the friends of each, in order to secure the success of all, when, perhaps, neither could be passed separately.   The evils of that species of omnibus legislation, which the Constitution designed to prohibit, are all invited by acts thus framed; and though we have no reason to suppose that those evils actually existed in the present case, or that there was any purpose on the part of the Legislature to disregard the constitutional requirement, yet we can

not be governed by these considerations if the act is of a class which is actually prohibited."

In *Rader* v. *Township of Union*, 39 N. J. 514, it was held that a statute entitled " An Act in relation to streets in Union Township," could not embrace a power to lay out a park. " The making and control of streets," says Mr. Chief Justice Beasley, " is a thing entirely different from the making of parks; the two have no connection, and neither is an adjunct to the other; and it is impossible, as it seems to me, to hold that a description of one embraces both."

In *Walker* v. *The State*, 49 Ala. 329, a statute entitled, "An act to restrict the sale of personal property in certain cases," which also provided that the willful destruction of personal property on which there was an unsatisfied lien, should be considered a criminal offense and punishable as a misdemeanor, was held to contain a subject foreign to that expressed in the title. And in *State* v. *Silva*, 9 Nev. 227, it was held that where a statute entitled "An act to regulate marks and brands," and containing a provision that any person who, with intent to defraud, kills any stock running at large, whether branded, marked, or not, shall, upon conviction, be deemed guilty of felony, was unconstitutional and void, because it contained a subject which bore no relation to the subject expressed in the title.

2. Moreover, the Legislature has not, in any of the provisions of the act under consideration, designated any particular river, stream, or locality within the State where drainage is necessary; nor has it located or established the boundaries of any drainage and assessment district within the limits of which taxes are to be levied, assessed, and collected, for the purpose of raising funds to defray the cost and expenses of the system of works designed by the act. What has been done is to appoint a commission constituted of State executive officers, one of whom—the State Engineer—is required to go over the State for the purpose of investigating the subject of drainage, with a view to the control of debris from mining and other operations, the improvement and rectification of river channels, the erection of embankments or dykes necessary for the protection of lands, towns, or cities from inunda-

tion, and the division of the State into several drainage districts, each of which shall include a territory drained by one natural system of drainage. This investigation was not intended to be advisory to the Legislature or to enable it to perform its duty with reference to the subject of the investigation; for, although the engineer was required to report the result of his examinations, his report was to be made to the board, of which he was a member, for their consideration, judgment and action, and not to the Legislature. In the consideration of the report the board could accept or reject it altogether, or amend it. If they reject it, that ended legislation upon the subject, and the act became dead. If they adopted it in its original form, or amended it, and adopted it as amended, they were, then, authorized to declare, by a resolution entered upon the record of their proceedings, the territory, as described and bounded in their report, to be a drainage district. The entire subject, including the necessity for drainage of any particular section of the State, and the creation and organization of drainage districts, was, therefore, referred, by the act, to the Board of Commissioners with power to legislate, and for that purpose an almost unlimited discretion was given to them. It was for them, in the exercise of their powers, to decide whether any drainage district, as contemplated by the act, was necessary at all or not, or whether there was a necessity for one or many. They could create one or many wherever, in their judgment, that necessity existed, whether they included a territory drained by one system of drainage or not. They could limit them to a particular section of the State, or they could cover the State with them. The entire act was thus made contingent upon their judgment and discretion. If they found some locality indicated by the act, the drainage of which was necessary to be improved or promoted, for the purposes provided for by the act, the statute was expedient. If, on the other hand, they found no such locality and no such necessity, the statute was inexpedient. But the provisions of the act were dead and unenforceable until revived by a determination of those questions by the commissioners. Not until they were finally determined, and one or more districts were created and organized, could the provisions of the act for a system of public

improvement within the district, and the levy, assessment, and collection of taxes to pay for it, be put in operation by the District Board of Directors. I think that the determination of those things could not be referred to a Board of Commissioners or other body. To decide upon the necessity for drainage for a part or all of the territory of a State is to declare a public purpose. To declare a public purpose, and to create a district over a designated area of the State, in which that purpose shall be accomplished, and to provide ways and means for its accomplishment, are matters which belong exclusively to the Legislature. If a necessity exists for the construction of public improvements within the State for a public purpose, the Legislature must declare it. If a district has to be created over an area of the State the Legislature must create it, and establish its limits. If property within it will be benefited by the improvement, the Legislature must determine it, and prescribe the rules upon which taxation must be apportioned. There are powers conferred upon it alone by the Constitution, and it can not delegate them to any other department of the government, or to any agency of its appointment, because it would be confiding to others that legislative discretion which legislators are bound to exercise themselves, and which they can not delegate to any other man or men to be exercised. (Cooley's Const. Lim. 121, 122.) Most of all, the Legislature can not delegate such powers to executive officers of the State, because the Constitution has divided the powers of government into three departments—the Legislative, Executive, and Judicial; and has declared that no person, charged with the exercise of powers properly belonging to one of these departments, shall exercise any function pertaining to either of the others, except it is expressly directed or permitted by the Constitution. (Const., art. iii, § 1.) No such direction or permission is contained in any part of the Constitution. I am, therefore, of opinion that the entire act is unconstitutional, because its provisions are made contingent upon the judgment and discretion of the board of Drainage Commissioners; and because in making it so contingent the Legislature delegated to the board powers which are not in their nature transferable (especially to executive officers of the State), and which can be exercised by the

Legislature alone. (*Houghton* v. *Austin*, 47 Cal. 653; *Ex parte Wall*, 48 id. 280; *Richardson* v. *Heydenfelt*, 46 id. 68.)

3. Furthermore, I think that the act is unconstitutional, because it authorizes a local board—the District Board of Directors—to levy a tax and two assessments for a public purposes, at the same time, upon the same property, in addition to a tax levied by the State for the same purpose, upon all the property of the State, which, of course, includes the property within the district. The first of these levies by the Board of Directors is authorized to be made upon all the property within the district; the second, upon "all hydraulic mines and upon all mines washing earth or ores with water running into the district;" and the third, upon the valuation of swamp and overflowed lands reclaimed by the construction of any of the works contemplated by the act. The first was to be made according to the standard of valuation; the second, upon the basis of "one half of one per cent. for each miner's inch of water of each twenty-four hours' run used during the year;" and the third, upon the basis of the value of the reclamation of the lands reclaimed, not to exceed three dollars per acre.

Of the power of the Legislature to authorize municipal corporations to impose or levy local rates, taxes, or assessments upon all property within the limits of a designated taxing district, there is no question; and that power may be exercised so as to authorize a *quasi* corporation—such as a Board of Commissioners or other body, whose rights and duties are prescribed by the Legislature, for a local purpose, within the limits of a special taxing district, designated by the Legislature. But none of these taxes or assessments is authorized to be levied for a local purpose. All the moneys to be raised by the modes prescribed by the act are to be used exclusively for paying the costs and expenses of the public works authorized to be constructed within each district, for the purposes embraced in the act. It is, therefore, a general public benefit, and a local board can not be authorized to levy local taxes and assessments for a public purpose. Such a power could not be conferred upon a municipal corporation (Const., art. xi., § 12), neither can it be conferred upon a *quasi* municipal corporation.

Besides, duplicate or triplicate taxation levied at the same time, and for the same purpose and upon the same property within a territory of the State which has not been established by the Legislature as a special taxing district, is void, whether levied according to the standard of valuation or benefits. Such taxation is destructive of that equality and uniformity which the Constitution requires for the validity of every tax.

Judgment reversed.

MORRISON, C. J., concurred in the judgment.

ROSS, J., concurring:

Quite a serious objection is made to the title of the act in question, but if that was the only objection to it, I do not know but that I would vote to sustain it. Undoubtedly some such title as this would have more nearly expressed its purpose as shown in its body: "An act to provide for the impounding of debris, and for the improvement and rectification of river channels in which debris flows, and to levy and collect taxes and assessments to pay the cost of the same." Still, there is a good deal of force in what is said in support of the proposition that the title—"An act to promote drainage"—is such an expression as would fairly and reasonably give notice of the subject embraced in the body. I express no opinion as to the title, since there is at least one objection urged, which, to my mind, is fatal to the legislation.

Our organic law declares: "The powers of the Government of the State of California shall be divided into three departments—Legislative, Executive, and Judicial; and *no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions pertaining to either of the others,* except as in this Constitution expressly directed or permitted." (Const., art. iii.)

The Governor, Surveyor-General, and State Engineer are *executive* officers, and are expressly prohibited by the constitutional provision just quoted from exercising any legislative or judicial powers, except as in the Constitution expressly directed or permitted. Yet the very first section of the act "to promote drainage" constitutes these executive

officers a " Board of Drainage Commissioners"—to do what ?
Not anything with reference to any drainage or other district
fixed or declared by the Legislature itself, for the Legislature
did not fix or declare any such district; but the *commis-
sioners* are to divide the State into drainage districts: " Sec-
tion 1. The Governor, Surveyor-General, and State Engineer
shall be the *ex officio* members of and constitute a Board of
Drainage. Commissioners, *to divide the State into several
drainage districts*, and organize the same as hereinafter pro-
vided."   *   *   *

" Section 2. Within thirty days after the passage of this
act, or as soon thereafter as may be practicable, the State
Engineer shall submit to said board a report or reports of his
investigations as to drainage, having in view the control of
debris from mining and other operations, the improvement
and rectification of river channels, the erection of embank-
ments or dykes necessary for the protection of lands, towns,
or cities from inundation.   He shall also make special exam-
inations with reference to the division of the State into sev-
eral drainage districts, each of which shall include a territory
drained by one natural system of drainage, and shall report
to the Board of Drainage Commissioners the result of his ex-
aminations, and shall from time to time propose boundaries
for such districts, and recommend their formation."

" Section 3.  After the State Engineer has reported the
boundaries and recommended the formation of one or more
drainage districts, the board shall proceed to consider the
same, and may adopt, amend, or reject said report; but if
adopted by them, either in its original form or as amended,
they shall, by resolution entered upon the record of their pro-
ceedings, declare the said territory to be, and the same shall
thereupon become, a drainage district," etc.

These provisions, in my opinion, clearly substitute the judg-
ment and discretion of the executive officers mentioned, in
the matter of the establishment of the drainage districts, for
the judgment and discretion of the Legislature itself.   The
act begins by creating them a Board of Drainage Commis-
sioners for the express purpose of dividing the State into
drainage districts.   Without any further directions in that
regard, the next section requires one of the commissioners—

the engineer—to submit to the board a report or reports containing the result of his investigations as to drainage, having in view the control of debris from mining and other operations, etc., followed by the provision that "he shall also make special examinations with reference to the division of the State into several drainage districts, each of which shall include a territory drained by one natural system of drainage, and shall report to the Board of Drainage Commissioners the result of his examinations, and shall *from time to time propose boundaries for such districts and recommend their formation.*"

The only limitation here imposed upon the engineer is that each district "shall include a territory drained by one natural system of drainage." But who is to say whether the district reported by the engineer does or does not include a territory drained by one natural system of drainage? The engineer's report is not to be made to the Legislature, for its action, but to the Board of Drainage Commissioners, of which the engineer is one. The act does not attempt to say what shall constitute a natural system of drainage. That matter is left, in the first instance, to the judgment and discretion of the State Engineer, and next, to the judgment and discretion of the Board of Drainage Commissioners. The engineer "shall *from time to time propose* boundaries for such districts and *recommend* their formation." His report is to be made to, and acted upon by the board, which *may* adopt, amend, or reject the report; *if* adopted, either in its original form or as amended, the board shall by resolution declare the territory to be, and the same shall thereupon become, a drainage district. It is perfectly plain that the duties thus devolved upon these executive officers are not ministerial. Without their action there is and can be no district at all. In organizing one or many they necessarily bring to bear their judgment and discretion. They say what territory is drained by one natural system of drainage, and determine the boundaries accordingly. Should they say that all that part of the State lying north of San Francisco is drained by one such system, and all that part of the State lying to the south of San Francisco is drained by another such system, and so establish the lines, who, if the act is valid, can question their determination? If they form a

hundred districts, is not their action equally conclusive? And who can compel them to form any?' They *may* adopt, amend, or reject the report of the engineer, and *if* adopted by them, either in its original form or as amended, the territory included becomes a district. But there is no power anywhere to compel them to establish any particular district or districts, for the act has left the determination of those questions to their judgment and discretion. This it could not constitutionally do. The establishment of such districts is a legislative function, to be exercised by a legislative body; and the Legislature is expressly prohibited by the Constitution of the State from clothing any of its *executive* officers with such power.

Numerous other objections are made to the act, which, in my view, need not be determined, since the one just considered is fatal to it.

THORNTON, J., concurred in the opinion of Mr. Justice ROSS.

MYRICK, J., concurring:

I. As to whether the object of the act is expressed in its title.

The title is "An act to promote drainage." It was held in *Goldthwait* v. *Inhabitants etc.*, 5 Gray, 63, that the word "drain" has no technical or exact meaning. Webster's Dictionary defines the word "drain" thus:

1. To draw off by degrees; to cause to flow gradually out or off; hence, to cause the exhaustion of.

2. To exhaust of liquid contents by draining them off; to make gradually dry or empty, to deprive of moisture; hence, to exhaust.

3. To cause to pass through some porous mass or substance for the purpose of clarifying; to filter.

And, "Drainage (Engin.), the system of drains and their operation, by which water is removed from towns, railway beds, and other works."

The definition of the word "drain" given in Worcester's Dictionary is somewhat different from Webster's, in that the idea expressed in the third definition as above is entirely omitted; thus showing that lexicographers differ.

Now, is it the object of the act, that the waters flowing down the river channels, bearing mining debris, shall be so impounded as that it shall flow off gradually; that the debris shall be exhausted of water and rendered dry; that the water shall pass through some porous substance, as, dams, for the purpose of being clarified of the debris; that they shall be held impounded so that the debris may settle, the waters then to pass off, without carrying the debris into the channels below? If yea, do not these purposes all come within the definitions? And if it is designed that the waters flowing in the lower channels, near cities and in the farming regions, shall be free from sediment, so that the channels shall not be filled and thus cause overflows, is not this and the construction of embankments parts of a system of drainage? I have examined the act in question, and I have not observed any provision inconsistent with, or having other objects in view, than the promotion of drainage. The Legislature has power to deem that a Board of Drainage Commissioners, a State Engineer, reports of such officers, the control of debris from mining and other operations, the improvement and rectification of river channels, the erection of embankments or dykes necessary for the protection of lands, towns, or cities from inundation, the creation of districts, and of district boards of directors, the erection of works, the condemnation of needed lands, the imposing and collection of assessments to provide necessary funds, to be proper parts of a system for the promotion of drainage; and if so, its opinion in that regard is binding upon us.

The people of this State have, through their regularly constituted representatives, declared in favor of such a system, with such provisions; and I see nothing in the act which renders it in this regard unconstitutional.

II. The proposition that the act in question is local, is scarcely tenable. Counsel for appellants state in their brief, in arguing upon this point: " The Court will take judicial notice of what portion of our State furnishes debris from mines," and they further state that " the only drainage district that ever can be formed under this act, and receive the benefit of the State tax, is the one attacked in this suit, and which assumes to embrace the territory drained by the Sac-

ramento River and its tributaries." It may well be doubted
if this Court can take judicial notice of what portion of the
State furnishes debris from mines, and it can hardly be prac-
ticable for counsel to forecast the possible future mining ter-
ritory of the State. I apprehend that such knowledge would
be very valuable. Who can tell whether at the headwaters
. of nearly every river in the State, from the Santa Ana to the
Klamath—the Los Angeles, the San Gabriel, the San Joaquin,
the Kern, the Merced, the Tuolumne, the Calaveras, Trinity,
Humboldt, Eel, Russian—there are not mineral-bearing lands,
which will next year, or at some time, by hydraulic or other
mining, yield debris to be carried down the streams? The
act is for the whole state, wherever there may be occasion
for its operation, at the present time, as well as any future
period. The area drained by the Sacramento River and the
other rivers above named (no one of which other rivers is
tributary to the Sacramento), comprises the larger portion of
the State, and we are not judicially advised but that there
have been and are at the present day mining operations on
the Tuolumne, Kern, San Gabriel, Calaveras, Klamath, Trin-
ity, Shasta, and others not within the drainage of the Sacra-
mento—even the tributaries of the Truckee.

It is scarcely necessary to say, that with the wisdom or
policy of this act the Courts have nothing to do; the personal
opinions of Judges as to the propriety of the act is not sought
for, and is of little importance. The legislative department
is to determine as to the policy of an act; the judicial as to its
constitutionality.

III. It is alleged that the act is unconstitutional, in that
the taxes to be levied and collected are not uniform, a portion
being provided to come from the State at large and a portion
from each district. The act provides that the requisite funds
shall come from four sources, viz.:

1. A tax of one twentieth of one per cent. is to be levied
upon all the property in the district, the money so raised to
go into the fund for the district.

2. An assessment *pro rata*, according to water used, is to
be made upon all mines washing earth or ores with water run-
ning in the district, the money to be placed to the credit of
the district.

3. An assessment per acre, is to be made on swamp and overflowed land which may be reclaimed by operations under the act, such funds also to go to the credit of the district.

4. A State tax of one twentieth of one per cent. is to be levied upon all the property in the State, which fund is to constitute a State drainage construction fund.

It has been suggested that these taxes and assessments, or the funds thereby to be raised, are unequal and unjust, not only because the property in the district is to be assessed for its portion of the State tax, and again for a portion of the district tax, and again (if swamp and overflowed land) for its reclamation, but there is to be a direct *pro rata* assessment upon mines for using water. In that connection, it is also suggested that if hydraulic mining is a legitimate avocation, and if miners have a legal right to wash ores and earth and let the debris flow into the streams, the imposing of a charge upon them for the protection of the property of persons below them is unjust; and on the other hand, if the miners have not the legal right to wash ores and earth in such manner as that the debris will flow into the streams, to the detriment of persons below, such persons owning property below should not and can not be made to bear any portion of the burden. There is much force in the suggestions. Let us see, then, how the questions involved *might* have appeared to the Legislature—for, as has been suggested, with us it is a question of *power*, not of policy. This Court will take judicial notice that there are rivers in this State, such as the Sacramento and San Joaquin, which are in law navigable streams. Whether they are or are not such *in fact*, we do not take judicial notice of. It is possible that those streams have, as a matter of fact, during thirty years of mining operations, been so filled with mining and other debris as that the navigation of them has been seriously interfered with; it may be that the Bay of San Francisco and the channels leading into and out of it have become less free for navigation. It may be, also, that the streams above the points of navigation have become so filled by the same cause as that the channels are insufficient to carry off surplus water during rainy seasons, thus causing lands within a given district to be overflowed. There is power in the Legislature to create districts for local improvements,

and to declare what lands are benefited, and to fix the charge upon such lands. It may be that the mining and agricultural interests of the State are so far interwoven with the general prosperity as that the State at large would be seriously injured unless each is permitted and protected. It may be to the interest of the State that the impending trial of legal right as between the mining and agricultural interests should be avoided if possible. It may be impossible for the agricultural interests to fix definitely the source of all the debris which has been or may be borne down the streams. It may be impossible for the owners of any one mine to show that the debris from that one mine has not tended to swell the aggregate going to the lower channels. Taking, then, all these suggestions into consideration—and they are but suggestions, and a few only of those which might be made—was it not competent for the Legislature to say: Here are the navigable waters and the other interests in which the State is concerned; the State is also, in a measure, interested in having its tax rolls increased rather than diminished; here are districts drained by a system of rivers, in which those districts are interested; here are towns and cities to be protected, even the capital of the State; here are agricultural interests, and here are mining interests; here are streams nearly or quite filled with debris, causing the inundation of immense tracts of country; the debris is *already* there—not threatened only, but *there*—and by a proper system of drainage these channels can be cleared and the waters flow in proper course; it is to the well-being of the State that none of these interests should be entirely done away with; the portion of the burden of protecting all, to be borne by the State at large, is the proportion that one twentieth of one per cent. of the taxable property of the State bears to the entire cost; the portion of the burden to be borne by the owners of mines besides the property tax, is, the *pro rata* water tax (or license, or whatever it may be called), named in the act; the portion of the burden to be borne by reclaimed lands, beyond the property tax, and as an increased value by reason of the reclamation, is the assessment thereon authorized by the act; and the portion of the burden to be borne by the district, for its own benefits, as distinct from the others, is the proportion

that one twentieth of one per cent. of the taxable property of the district bears to the entire cost. Was it not competent for the Legislature to so say and determine ? All these questions are questions of fact, or of State and local policy.

I have avoided the consideration of the questions in dispute in this State between the mining and agricultural interests, further than to show that the Legislature might, in the interests of the people at large, take those questions into consideration in endeavoring to inaugurate a plan for the compromise and mutual satisfaction of those interests. The Courts, should they be called upon to deal with those questions, must be governed by the law as they find it to be; and the losing party must abide the result; but it is competent for the Legislature, and it may frequently be the wiser, to harmonize conflicting interests, by pursuing such course as may not be inconsistent with the Constitution; and, if the statute of one year shall not be found to operate in accordance with the public will, amendment or repeal may be an adequate remedy.

IV. In my view, however, the act is obnoxious to the Constitution; and that is in that part of it discussed in the opinion of Mr. Justice Ross, and in paragraph ii of the opinion of Mr. Justice McKee. Suppose the act, instead of saying, the Governor, Surveyor-General, and State Engineer shall constitute a Board of Drainage Commissioners to divide the State into several drainage districts, had said, the Governor, the Chief Justice of this Court, and a Judge of the Superior Court of Sacramento County shall constitute a board for the same purpose, would it not have been an endeavor to cast upon members of two departments of the Government functions which are, under the Constitution, to be exercised by the other department ? To create districts and to parcel out the State is a legislative function. The principle decided in *Borel* v. *Boggs*, December 28th, 1880, does not apply to this case. The acts involved in that case established the lines of the counties, leaving to the surveyor the duty, merely, of marking the lines thus established.

It may be very much doubted if, by the so-called Drainage Act, even its probable meaning and intent is expressed, viz.: In speaking of the formation of the districts, it says, " each of which shall include a territory drained by one natural sys-

tem of drainage." It does not say that each district shall include *all* the territory drained by one system, but that the territory included within the district shall be drained by one system; a distinction leaving open a wide door for the creation of an almost unlimited number of districts.

Therefore, and for the reasons given upon this subject by Mr. Justice McKee and Justice Ross, I concur in the judgment.

McKINSTRY, J., concurring:

I feel compelled to concur in the judgment.

1. It seems to me to be perfectly safe to say that the Legislature would not have passed the act under consideration had it contained only the section which provides for a general tax throughout the State. The statute provides: First, for a tax upon all the property in the State; second, for an additional tax upon all the property within any "district" which may be defined by the Governor, Surveyor-General, and State Engineer; third, for a tax—in addition to the other two—of three dollars an acre on any lands within the district which may be "reclaimed;" fourth, for a tax or license to be paid by each person, carrying on hydraulic mining within the district, which he is to pay on top of the direct State and district taxes.

A reference to the debates in the Senate and Assembly will show that the statute commended itself to the support of members by reason of this unequal distribution of the burden of taxation. All that relates to the State tax is found in one of twenty-nine sections. The State tax is but part of a scheme, which certainly contemplates not merely that a State tax shall be levied and collected, but that work shall be done, and the local taxes be also levied and collected. The distribution of a statute into sections is purely artificial, and the real point always is whether the provisions are essentially and inseparably connected in substance. (*Robinson* v. *Bidwell*, 22 Cal. 379; *Commonwealth* v. *Hutchings*, 5 Gray, 585.) It is a well-settled rule that when a portion of an act is constitutional and another is unconstitutional, if the two are so inseparably blended together as to make it clear that either clause would not have been enacted without the other, the

whole act must fall. (*San Francisco* v. *S. V. W. W.*, 48 Cal. 494.)

2. The act does not contain a legislative declaration that the draining of any and all overflowed lands in the State shall constitute a public benefit, or that the draining of any definite tract of such lands will be of benefit to the occupants or owners of adjacent lands—as a sanitary measure or otherwise. If the act had declared that lands specifically described should be drained, I am not prepared to say that the task of ascertaining what lands would be benefited might not be assigned to executive officers, or that the lands reported by such officers would not constitute a legal assessment district. (*Sed query?* Cooley on Taxation, 113.) But by the act in question the whole discretion of determining whether the draining of any lands which they may select will be beneficial to a greater or lesser public, is transferred to three State executive officers (not constituting a local legislative body), to whom is confided the power of deciding that a tax shall be levied upon those whom *they* shall adjudge will be benefited by a work which *they* shall declare to be public and expedient. A statute which should attempt to empower an executive officer to decide that any work, anywhere in the State, which he might deem of public benefit should be a public work, and that he might lay out a district to be assessed for the construction of such work, would be objectionable only in degree more than the act before us. Such powers are legislative, and can not be delegated to executive or judicial officers.

3. But the act creates no relation between the taxes to be levied within any district which the State Board may choose to establish and the benefits received by such district. It is only where such relation exists or is provided for that assessments for local benefits can be upheld. Local assessments are imposed occasionally as required upon a limited class of persons interested in a local improvement, and who are assumed to be benefited by the improvement to the extent of the assessment; and they are imposed and collected as an *equivalent* for that *benefit*, and to pay for the improvement. They are known distinctively as "assessments for benefits." (*Nichols* v. *Bridgeport*, 24 Conn. 207; 36 id. 255, 262.) The theory of the law is that full compensation is received in

every instance. (Cooley on Tax. 431.) The several taxes provided for by the act of April 23d, 1880, are arbitrary. All the property within a district *must pay* one twentieth of one per cent. on its value; all the lands reclaimed must pay three dollars an acre, etc. If more money is collected in the district by the various means named in the act than is necessary to pay for the work done and incidental expenses (a contingency which, however improbable, may arise) what becomes of the excess? All other laws which have provided for assessments, for local benefits, have furnished a mode by which the amount necessary to secure the benefit is to be ascertained before the assessment is levied. Unless so provided for, each person assessed may pay *more* than an equivalent for the benefit he receives. So far as the tax on all the lands in a district is concerned, it may under the act be required to be paid before the work is completed or commenced. But, if this were not so, the defect is in the law itself, which can not be held to be good, because, by possibility, all the money raised in the State at large, and from the three modes of taxation applicable within a district, *may be expended* by the Board of Directors of that district. The limited time accorded me will not permit an elaboration of this view.

SHARPSTEIN, J., dissenting:

It seems to me that most of the grounds upon which it is claimed that the "act to promote drainage" is unconstitutional can not be considered in this case. Courts will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect. A statute is assumed to be valid until some one complains whose rights it invades. (Cooley's Const. Lim. 163.) In the language of the code: "Every action must be prosecuted in the name of the real party in interest." This action is brought by the people of the State, and if the provisions which affect them are constitutional, they are not necessarily affected by the other provisions of the act, even though they be unconstitutional. "A statute may contain some such provisions, and yet the same act, having received the sanction of all branches of the Legislature, and being in the form of law, may contain other useful and salutary provisions not obnoxious to any just con-

stitutional exception.    It would be inconsistent with all just
principles of constitutional law to adjudge these enactments
void because they are associated in the same act, but not con-
nected with or dependent on others which are unconstitu-
tional.    (Cooley's Const. Lim. 177.)

I know of no provision of the Constitution, and am not
advised that it is claimed that there is any, to which this act,
so far as it provides for the reclamation of overflowed lands,
the rectification of river courses, and the impounding of de-
bris, at the expense of the State, under the direction of Com-
missioners and Directors, named in the act, or whose appoint-
ment is authorized by it, is repugnant.    But it is claimed
that the power conferred upon the Board of Drainage Com-
missioners, to fix the boundaries of drainage districts, is legis-
lative in its character, and can not be delegated to the exec-
utive officers who, by virtue of the act, constitute that board.
" One of the settled maxims in constitutional law is, that the
power conferred upon the Legislature to make laws can not
be delegated by that department to any other body or author-
ity."    (Cooley's Const. Lim. 116.)    If the act under consider-
ation attempts to delegate that power to any other depart-
ment of the Government, or to any board, person, or persons
whatsoever, it must be held to be, to that extent, at least, un-
constitutional.

It can make no difference whether the attempt is made to
confer that power upon another department of the Govern-
ment, or upon persons not connected with the Government.
The power cannot be delegated.

The objection, however, is not that an attempt is made to
delegate the law-making power to a Board of Drainage Com-
missioners, but that the act authorizes the board to establish
drainage districts, and that that is purely legislative.    Whether
it be or not, I think, must depend upon the object for which
such a district is formed.    If formed for the purpose of levy-
ing a special tax upon the property within it, to defray the
expenses of improvements, assumed to be more beneficial to
the inhabitants of such district than to others, the rule doubt-
less is that the Legislature must determine what shall consti-
tute such a district, unless the nature of the case conclusively

fixes it. The object of dividing the State into districts, as stated in the act, is not for the purpose of determining what portions of the State shall be assessed or taxed to pay the cost of the work. Each district is to be composed of "territory drained by one natural system of drainage." It seems to me that the formation of districts upon that plan would require engineering, rather than legislative skill.

Whether the designation of officers, commissioners, or persons to determine within what limits lands shall be held to be benefited by an improvement, would constitute a delegation of legislative power, is a question which, as I view it, does not arise in this case.

I am not satisfied that the Legislature did not possess the constitutional power:

1. To appoint the officers, named in the act, as a board of drainage commissioners, with power to divide the State into drainage districts and to organize the same.

2. To authorize the Governor to appoint directors to prosecute the work contemplated by the act, within any such organized district.

3. To levy a State tax for the purpose of raising money to defray the expenses of said work.

Unless some or all of these provisions of the act are unconstitutional, this action can not, in my judgment, be maintained.

The prayer of the complaint is:

" I. That said defendants and each of them be ousted from said office of Director of Drainage District Number One of said State.

" II. That said defendants be perpetually enjoined and restrained from letting any contracts for the building of dykes, embankments, or other works for the drainage of said district.

" III. That said defendants be perpetually enjoined from levying any tax whatever upon the property, or any property within said district for the purpose of providing funds for the payment of the cost of building works of drainage, or any other purpose.

" IV. For the decree of this Court determining that said asserted Drainage District Number One has not been legally formed, and is not a drainage district."

For reasons which I have stated, I do not think that the act is so clearly unconstitutional as to entitle the plaintiff to the relief prayed in the first, second, or fourth paragraphs of the prayer. As to the third, I do not think that the people of the state can be heard to object to the levying of a tax upon property within the district designated. As before intimated, I think that the legality of that tax can only be called in question by some person or persons who, if its collection be not enjoined, will be liable to pay some part of it.

It is not claimed that the people of the entire State occupy that position.

The conclusion at which I have arrived is, that if all those provisions of the act which contemplate the raising of funds by taxation or assessing any property other than that of the entire State, should be held to be unconstitutional, the defendants could not be ousted from office, nor enjoined from letting contracts, nor, in this action, from levying a tax within the district specified. And if the act be constitutional, to the extent to which I think it to be, it is quite clear that this Court can not hold that said district has not been legally formed.

It not being clear to my mind that those provisions of the act which affect the people of the entire State are unconstitutional, I think that the judgment of the Court below should be affirmed.