[Crim. No. 2540.  Second Appellate District, Division Two.—September 30, 1934.]

In the Matter of the Application of R. G. LASSWELL for a Writ of Habeas Corpus.

184

J. Wesley Cupp for Petitioner.

John K. Hull and D. A. Boone for Respondent.

STEPHENS, P. J.—The petitioner herein is charged with five counts of violation of section 6, chapter 1037, of the Statutes of 1933 of the state of California, commonly referred to, in conjunction with chapter 1039 of the Statutes of 1933, as the California Industrial Recovery Act, such statute appearing as Act 6775 of title 613a in the General Laws of 1933, and in particular is charged with having violated subsections 1, 7, 14 and 16 of article VII of the Code of Fair Competition for the Cleaning and Dyeing Trade, which code became a part of the statute by section 2 thereof, if section 2 is within the state Constitution.

Count 1 of the complaint alleges a violation of the act, including the code of fair competition, "in that said defendant did . . . clean and press . . . a lady's dress for the sum of fifty cents (50c), being then and there a sum less than the minimum retail price established", etc. Count II of the complaint alleges a violation of the act and such code " . . . in that the said defendant did . . . clean and press . . . a man's three piece suit for the sum of fifty cents (50c), being then and there a sum less than the minimum retail price established", etc. Count III of the complaint alleges as a violation of the act and such code "did wilfully and unlawfully violate the terms and provisions of the Code of Fair Competition of the Cleaning and Dyeing Trade, in that said defendant did, at the time and place last aforesaid, fail to display Insurance Information in a conspicuous place, or at all, as to whether or not the said defendant insured against the hazards of the cleaning and/or dyeing of fabrics for the benefit of the consumer, contrary to section 141, article 7 of the said Code of Fair Competition". Count IV of the complaint alleges a violation of the act and such code "in that said defendant did, . . . accept cleaning and pressing work from one who solicits cleaning and/or dyeing work and from one who was neither a member of the Cleaning and Dyeing Trade nor regularly employed by a member of that trade". Count V of the complaint alleges a violation of the act and such code "in that the said defendant did, at the time and place last aforesaid, advertise in a false and

misleading manner in that the said defendant did display the insignia of the National Recovery Administration, to-wit, the blue eagle, while violating the provisions of the said Code of Fair Competition for the Cleaning and Dyeing Trade''.

The petitioner herein seeks his release on *habeas corpus* on the ground that he is illegally restrained of his liberty under a statute which he claims is unconstitutional on the following grounds: (1) The California Industrial Recovery Act is unconstitutional as a violation of the Fourteenth Amendment of the federal Constitution and in the impairment of the obligations of contract clause of the federal and state Constitutions. (2) The state legislature of California, contrary to the requirement of article III, section 1, of its Constitution and contrary to the federal Constitution, delegated to the federal government administration boards its right to control and legislate concerning local business and intrastate commerce.

The federal enactment of June 16, 1933, C. ——, 48 Stat. 195, c. 90, denominated ''National Industrial Recovery Act'', commonly referred to as ''N. I. R. A.'' in section 1, declares that a national unemployment and industrial emergency exists, in the following terms: ''A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of co-operative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.''

Section 2 fixes the expiration date of the act and the matter of "administrative agencies" by which the scheme proposed may be effectuated, as follows: "(a) To effectuate the policy of this title, the President is hereby authorized to establish such agencies, to accept and utilize such voluntary and uncompensated services, to appoint, without regard to the provisions of the civil service laws, such officers and employees, and to utilize such federal officers and employees, and, with the consent of the State, such State and local officers and employees, as he may find necessary, to prescribe their authorities, duties, responsibilities, and tenure, and, without regard to the Classification Act of 1923, as amended, to fix the compensation of any officers and employees so appointed. (b) The President may delegate any of his functions and powers under this title to such officers, agents, and employees as he may designate or appoint, and may establish an industrial planning and research agency to aid in carrying out his functions under this title. (c) This title shall cease to be in effect and any agencies established hereunder shall cease to exist at the expiration of two years after the date of enactment of this act, or sooner if the President shall by proclamation or the Congress shall by joint resolution declare that the emergency recognized by section 1 has ended."

Section 3 under the subtitle of "Codes of Fair Competition" treats in detail of code regulation of industry as follows: "(a) Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall

deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared.''

The state acts declare a state and national emergency very much after the fashion of the federal act and declare a policy as follows: ''It is hereby declared to be the policy of the State of California to cooperate with and assist the National government in promoting the rehabilitation of trade and industry and in eliminating unfair competitive practices, and to establish a parity in the maximum hours of labor and the minimum rates of pay and the other conditions of employment and standards of fair competition within this State between those in trades and industries or subdivisions thereof engaged in transactions in or affecting intrastate commerce in this state and those engaged therein in transactions in or affecting interstate or foreign commerce.''

So far as this case is concerned, we may say that the federal statute was adopted by the state and that it was provided in the adopting statute that when the federal authorities had fixed a code for the operation of any industry, that code automatically became the state code therefor. The state statute provides also that a violation of such code shall be a misdemeanor and prescribes a penalty for such violation. Thus we have the unavoidable collision of the difference of opinion that causes this proceeding in the consideration of the following questions: (a) Can industry be so regulated? (b) Can the state legally adopt the federal code regulations by reference?

It is a salutary doctrine that statutes should be sustained by the courts wherever and whenever this is reasonably possible. It is the purpose, right and duty of the legislative branch of the government to enact such legislation as it deems desirable and its limitations are natural law and the written Constitutions; the courts have no voice

in the policy nor in the wisdom of legislative action; they construe the language of the statute and determine its constitutional status.

Chief Justice Marshall and his associates on the Supreme Bench were statesmen, and there is statesmanship in judicial opinions. These men lived through the founding of this nation and were contemporaries of the Constitution framers. They wrote the primary rules for the construction of the Constitution from a broad comprehension of the young nation's structure, its duties and obligations, and with an intimate knowledge of the current history. They early determined against a narrow, literal construction and held that the Constitution was never intended as a detailed statute but rather as a working set of practical principles. It was Marshall who exclaimed, "We must never forget that it is a Constitution we are expounding, a Constitution intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." (*M'Culloch* v. *Maryland,* 4 Wheat. 316 [4 L. Ed. 579].) After the experience of over 147 years, it now seems apparent that any other conception of the great charter would have caused frequent amendments to it (difficult as amendment is) to meet the requirements of new and changing social influences. Only through this view of the Constitution has it remained the preserver of great fundamental principles instead of becoming a compilation of fixed statutes inevitably delaying, if not preventing, progress.

We have read the great decisions of the Supreme Court of the United States relevant to the issues of this cause and have noted the "adaptation" of the constitutional section pertinent here to the "various crises of our economic history". We perceive that they do not differ upon the principle expressed by Marshall but that they show a constant conflict of opinion as to the extent of "filling in" Marshall's concept authorizes the courts to do. The thought that seems to have sent the Supreme Court to its liberal interpretation of the due process and contract clauses of the Constitution in the Munn case (*Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77]), to the stricter construction in the New York theater case (*Tyson & Bro.* v. *Banton,* 273 U. S. 418 [47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236]), and back again to the high point of liberal construc-

tion in the Blaisdell case, 290 U. S. 398 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, and Nebbia case, 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469], *infra,* is the *laissez-faire* conception of constitutional economics. It may be stated with assurance that there is little historic basis for the doctrine that the government, legally speaking, must "let commerce alone", either in the English law or in American law. As a matter of historic fact, the conception that business is immune from government, as to restricting its practices, but is the legal subject of governmental protection and extension, reached its high point after the Civil War. But soon anti-trust or anti-monopoly, rate-making and safety appliance, usury and other regulatory legislation began to appear. It may be said that government in business is more of an economic question than a legal one.

There are two very late United States Supreme Court opinions of great assistance to us in this proceeding. These opinions thoroughly analyze the previous opinions and pronounce doctrines which seem convincing to us. We shall examine them. The case of *Home Builders & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481], arose through a state legislative enactment that very materially affected the right of foreclosure of an encumbrance on real estate. The statute was based upon the same general emergency alleged in the acts before us and expressed in much the same way. It will be well to remember that in the cited case the contract affected was an existing and definite real estate encumbrance, including definite statutory rights of foreclosure. The remedial legislation postponed the foreclosure beyond the contract date and provided for compensation to the encumbrance beneficiary in the form of the rental value of the premises for the period of postponement. In the instant case, the enforcement of the remedial statute would apply as well to future contracts and offers no compensation to contract beneficiaries except the general good resulting. ■ We think, however, that the reasoning of both the Blaisdell and Nebbia cases, *supra,* leads to the conclusion that the abridgment of contract is not a constitutional infringement if the public welfare demands it. As a corollary to this principle, it necessarily follows that the general welfare should never be

protected in such a manner as to unnecessarily deprive individuals of their contract benefits. Thus in the Blaisdell case, *supra,* it will be seen that the rental value of the premises could reasonably be paid and yet the taking of the property could be prevented. In the Nebbia case, *supra,* and the instant case, it will be seen that no such provision was possible. We shall proceed to quote liberally from Mr. Chief Justice Hughes' opinion in the Blaisdell case, *supra:*

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system."

And later in the same opinion he says:

"But even the war power does not remove constitutional limitations safeguarding essential liberties. When the provisions of the Constitution, in grant or restriction, are specific, so particularized as not to admit of construction, no question is presented. . . . But where constitutional grants and limitations of power are set forth in general clauses, which afford a broad outline, the process of construction is essential to fill in the details. That is true of the contract clause. . . . To ascertain the scope of the constitutional prohibition we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. . . . Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with

the necessary residuum of state power has had progressive recognition in the decisions of this court. . . . The economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts."

After citing cases with comment, the Chief Justice continues:

"It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests" (and the Chief Justice might have mentioned as added reasons for "an increased use of the organization of society" the advent of perfected labor-saving machines almost coincident with the passing of the frontier and the labor and business competition of foreigners and first generation of American-born who are content to live far below the American standard) "have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the State itself were touched only remotely, it has later been found that the fundamental interests of the State are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends."

The opinion holds that an emergency existed; that the legislation was addressed to a legitimate end, not for "particular individuals but for the protection of a basic interest in society", that the legislation was reasonable and concluded that the statute did not deny the equal protection of the laws to defendant.

The other case calling for some detailed consideration is *Nebbia* v. *New York*, 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]. The defendant Nebbia was convicted of violating an order of the state milk control board fixing retail prices to be charged by stores and he

appealed. The state legislature established a milk control board with power to "fix minimum and maximum . . . retail prices to be charged by . . . stores to consumers for consumption off the premises where sold". The board made extensive investigations and findings as to the condition of the milk trade and fixed a price in accordance with the authorization and Nebbia was convicted of selling contrary thereto. Milk and the sale of milk have been the subjects of regulation in New York for many years, and whether or not the condition at the time of the regulatory order was in the nature of an emergency which we usually comprehend as being a different and radical change from the normal does not seem to us to affect the principle applied by the court in sustaining this legislation. Conditions were found to exist which were inimical to the trade and to the best interests of the consumers of an important food product generally used. The commission found, quoting from Mr. Justice Roberts' opinion, that "The production and distribution of milk is a paramount industry of the state and largely affects the health and prosperity of its people." Defendant claimed that he was not given the equal protection of the laws and, after disposing of that issue adversely, the opinion treats of the other defense, to wit, that defendant has been denied due process of the law under the provisions of the Fourteenth Amendment to the federal Constitution. The justice says in part:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. . . . Justice Barbour said for this court: ' . . . It is not only the right but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or re-

strained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.' (*City of New York* v. *Miln*, 11 Pet. 102, 139 [9 L. Ed. 648, 662].) Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given''. (Omitted from this opinion.) ''These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in. contest. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need. The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects State action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts. The reports of our decisions abound with cases in which the citizen, individual or corporate, has vainly invoked the Fourteenth Amendment in resistance to necessary and appropriate exertion of the police power. The court has

repeatedly sustained curtailment of enjoyment of private property, in the public interests. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community.''

The opinion ably analyzes the principles of regulation of private property and cites many cases illustrative of these principles. It then takes up the claim of defendant that price fixing is illegal or forbidden by the Fourteenth Amendment. It disposes of the possible claim that the business is a monopoly or that it is a public utility or that it requires a franchise, resolving all these suggestions in the negative. The justice then puts a question and answers it:

''But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. (*Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77].)''

Adverting to the argument that the basis for the holding in the Munn, or elevator, case (*Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77]) was that the business was a monopoly and was affected with a public interest, the opinion quotes from the Munn opinion as follows:

''Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large'' and comments thereon: ''Thus understood, 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression. . . . The statement that one has dedicated his property to a public use is, therefore, merely another way of saying that if one embarks in a business which public interest

demands shall be regulated, he must know regulation will ensue.''

The opinion later goes on: ''So far as the requirement of due process is concerned and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislative arm, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' (*Northern Securities Co.* v. *United States,* 193 U. S. 197 [24 Sup. Ct. 436, 48 L. Ed. 679].) And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy, or practicability, of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.'' (See, also, *Hampton, Jr., & Co.* v. *United States,* 276 U. S. 394 [48 Sup. Ct. 348, 72 L. Ed. 624].)

We think the rationale of the Supreme Court's opinions, though it does not reconcile all of them with the same principle, is that any business may be regulated to the extent and in the manner reasonably required to prevent its unreasonable interference with the welfare of the general public.

Applying these principles to the instant case, it seems to us that a condition has been pronounced as existing,

which not only justifies but demands remedial action. That such a condition was existing at the time the questioned statutes were enacted and at the time of the alleged offenses of which petitioner is accused, cannot be doubted. That the regulation provided for in the acts was germane to the condition and was not discriminatory nor arbitrary seems equally clear. We think the acts were within the state and federal Constitutions unless the delegation of the power to prescribe codes is unconstitutional and we shall therefore proceed to examine that question.

■ Petitioner claims that the California act contravenes article III of the California Constitution in that the acceptance of the President's code is an unwarranted delegation of the legislative power. The provision requires that the state's functions—legislative, executive and judicial—shall be kept separate each from the other. A comprehensive treatise on the subject of delegation of legislative powers is written into the opinion of Mr. Justice Lamar in the case of *United States* v. *Grimaud*, 220 U. S. 506 [31 Sup. Ct. 480, 55 L. Ed. 563], and we shall hereinafter more particularly examine that case. The United States Constitution contains no specific prohibition against the delegation of the legislative powers of Congress, but it is logically deduced that since the Constitution divides the government into three distinct divisions, it does not lie in the power of Congress to delegate its power to another governmental division. As courts so often go back to Chief Justice Marshall for fundamental statements on constitutional questions so did Justice Lamar in the case referred to, when he quoted the following from *Wayman* v. *Southard,* 10 Wheat. 42 [6 L. Ed. 262]. The court was considering the power of courts to make rules for their own guidance:

"It will not be contended that congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But congress may certainly delegate to others powers which the legislature may rightly exercise itself."

Justice Lamar then comments:

"What were these nonlegislative powers which congress could exercise, but which might also be delegated to others, was not determined, for he (Marshall) said: 'The line has not been exactly drawn which separates those important

subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details. From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations, not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when congress had legislated and indicated its will, it could give to those who were to act under such general provisions power to fill up the details by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by congress, or by penalties fixed by congress, or measured by the injury done.' '' (See, also, *United States* v. *Spotless Dollar Cleaners*, 6 Fed. Supp. 725.)

Lately the term ''primary standard'' has come into use as a comprehensive expression for the legislative enactment that requires administration to ''fill up the details''. As in the cited case, so in the California Supreme Court cases, a very broad and liberal construction has been given to ''the power to fill up the details''. We shall briefly notice some of the California cases, but first we shall further consider *United States* v. *Grimaud, supra*. The basis for this case was a congressional act providing for governmental forest reserves in the public domain. This act provided that the purposes of such reservations were ''to improve and protect the forest and to secure favorable conditions of water flows''. The cabinet secretary, under whose jurisdiction the forest reserves fell, was authorized by the act to ''make such rules and regulations and establish such service as will insure the objects of such reservations; namely, to regulate their occupancy and use, and to preserve the forests thereon from destruction; and any violation of the provisions of this act or such rules and regulations shall be punished'', etc. The secretary propounded rules and regulations as to the pasturing of sheep and cattle on the reserve and Grimaud was arrested and convicted of an offense of violating such rules and regulations. The conviction was sustained as against the claim that such rules and regulations were legislation which Congress could not delegate.

We shall proceed to examine some California authorities.

*Ex parte Gerino, (habeas corpus)* 143 Cal. 412 [77 Pac. 166, 66 L. R. A. 249]. The legislature prescribed certain requirements for the issuance of a certificate to practice medicine and among others the candidate was not allowed to take the examination before an examining board unless he should produce "a diploma issued by some legally chartered medical school, the requirements of which medical school shall have been at the time of granting such diploma in no particular less than those prescribed by the Association of American Medical Colleges for that year". Petitioner claimed that this provision delegated to the association named the power to fix this standard, a power which could only be exercised by the legislature itself. The court said in part:

"It being proper for the legislature to demand some standard of efficiency, as we have seen, we think it is equally within its powers to declare that it shall be the same as that prescribed from time to time by an association composed of colleges devoted to the work of preparing persons for the profession. Evidently the standard of proficiency in scholarship as a preparation, and the particular studies necessary to secure a fair preparation, must change as the discoveries in natural science open new fields of investigation and suggest or reveal new curative agencies. The legislature cannot successfully prescribe in advance a standard to meet these new and changing conditions. The method adopted appears to be sufficiently definite to enable all colleges to reach the required standard when in good faith they desire to do so. The law is as fixed, definite, and certain in this respect as the nature of the subject and the object to be attained will permit, and we do not think it should be held void because it adopts the standard fixed from time to time by those who, it will be presumed, are the most eminent in the profession which it attempts to regulate, and who should be the most interested in maintaining the highest degree of professional efficiency, skill and training." This holding was followed and approved in *Arwine* v. *Board of Medical Examiners,* 151 Cal. 499 [91 Pac. 319].

The case of *Metropolitan Water Dist.* v. *Whitsett,* 215 Cal. 400 [10 Pac. (2d) 751], was decided in April, 1932. This was a petition in mandate to require the respondent, who is the president and executive officer of petitioner, a

public incorporated governmental body, to execute a contract. Respondent refused because the petitioner had not ascertained and specified in its notice inviting proposals and had not inserted in the contract, the general prevailing rate *per diem* wages in the locality in which the work was to be performed for each craft or type of workman or mechanic needed to execute the contract, as required by the provisions of the act. It was contended, among other things, that there was an unwarranted delegation of power to the commission in that the general prevailing rate *per diem* wages in the locality in which the work was to be performed, etc., were indefinite expressions. The court, however, disposed of these contentions by showing that the board was authorized by the act to ascertain the prevailing rate of "fair market value" of such labor and that such finding became final and definite in the contract. As to the indefiniteness of the locality in which the work was to be performed, the court held that it was an expression of sufficient definiteness. The court says:

"It is unnecessary to cite cases to the effect that it has become a firmly established rule of law that a large measure of discretion may be delegated to administrative officers and boards. Here the determination of the board of directors is made final. This does not mean that the action of the board may be arbitrary or capricious, but the proper administration of the statute will be presumed. Difficulties of such administration are presented by way of argument, but they do not present judicial questions."

The subject-matter is well summed up in the opinion of *Gaylord* v. *City of Pasadena*, 175 Cal. 433 [166 Pac. 348]:

"Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—nation, state and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are entrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of

transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as the Supreme Court of the United States says: 'Indeed, it is not too much to say that a denial to congress of the right, under the Constitution, to delegate the power to determine some fact of the state of things upon which the enforcement of its enactment depends, would be "to stop the wheels of government" and bring about confusion, if not paralysis, in the conduct of the public business.' " (See *Union Bridge Co.* v. *United States,* 204 U. S. 364 [27 Sup. Ct. 367, 51 L. Ed. 523].)

The comparatively late case of *In re Peppers,* 189 Cal. 682 [209 Pac. 896], contains language that would seem to be in conflict with the other cases herein mentioned. This case arose on *habeas corpus,* the petitioner having been placed under restraint upon a complaint charging him, in three counts, with having violated "The California Fruit and Vegetable Standardization Act". (Chap. 719, Cal. Stats. 1921.) We are concerned only with count 2. This act sets out in detail various standards for fruit, grapes, melons, vegetables, berries and their containers. It provides in detail when oranges shall be deemed properly matured for shipment or sale. It provides only the following regarding frosted oranges: "Oranges shall be unfit for shipment when frosted to the extent of endangering the reputation of the citrus industry if shipped." The act provides a penalty in the following language: "It shall be unlawful for any person to pack or cause to be packed for sale or shipment any (articles) specified in this act that do not conform to the standards herein provided." It then makes deceptive or mislabeled packs unlawful and declares: "Any person . . . who shall violate any of the provisions of this act shall be deemed to be guilty of a misdemeanor." The very next succeeding section of the act refers to rules as follows: "Sec. 15. The director of agriculture is empowered to define, promulgate and enforce such rules and regulations as may be deemed necessary to carry out the provisions of this act, and to prescribe the limits of tolerance within which deviations from the standard dimensions set forth in section seven shall be permitted."

It is perfectly clear that the act was not drawn with the idea of prescribing a primary standard with the details to be filled in by the administrative officer, as the details of all of the standards provided for or authorized are set up in the act. However, the director of agriculture did prescribe detailed particulars as to just what should constitute a frozen orange that would "endanger the citrus industry if shipped". It is claimed that petitioner violated this regulation and the court "assuming but not deciding" that this regulation was within the act as a *filling in of the details* said that the legislature could not so delegate its "exclusive powers" and cited authorities. With great respect for the author of the opinion, we submit that there was no occasion for assuming that the statute attempted to authorize the making of detailed standards by rules and regulations and that the point ruled upon was not properly before the court. With the same respect, we assert that but one of the authorities cited sustains the view of the justice on the point treated. This case, *People* v. *Parks*, 58 Cal. 624, cannot be a convincing authority for the reason that it shows the Supreme Court in hopeless disagreement with only three of the seven certainly expressing agreement on the point here being considered. There is another reason why this point was not before the court in the Peppers case and therefore why it cannot be taken as authority upon it. The penalty clause does not make the violation of the rules and regulations to be prescribed by the director an offense. After stating that violations of the provisions of the act shall be a misdemeanor, it does not, as in the Grimaud case, *supra,* add the phrase "or such rules and regulations". A specific ruling upon this exact point upon a statute using almost the identical language as that used in the statute under consideration in the Peppers case is made in *In re McLain,* 190 Cal. 376, at pages 378 and 379 [212 Pac. 620].

The absence of the provision in the primary standard law authorizing penal action and the insufficiency of the primary standard law in other particulars form the basis of the decisions in the following cases: *Schaezlein* v. *Cabaniss,* 135 Cal. 466 [67 Pac. 755, 87 Am. St. Rep. 122, 56 L. R. A. 733] ; *Board of Harbor Commrs.* v. *Excelsior Redwood Co.,* 88 Cal. 491 [26 Pac. 375, 22 Am. St. Rep. 321] ; *Ex parte Cox,* 63

Cal. 21; *In re McLain, supra; Englebretson* v. *Industrial Acc. Com.,* 170 Cal. 793 [151 Pac. 421].

The problem then seems reducible to the following: There must be an overlying law which constitutes the *primary standard.* The function of the delegated power must be "to determine some fact or the state of things upon which the enforcement 'of the primary standard law' depends".

We have before us state and federal acts, both of which recognize a nation-wide business collapse and its resultant trail of human misery. Both state and nation are attempting to rehabilitate the interchange of produce. Both governments have decreed that this can best be done through the enactments of codes for business which shall be the standards of fair competition. These decrees are the overlying laws or the primary standards. The power to fill in the details is the delegated power.

The incidental objection that the codes are not in being when their violation is made an offense is immaterial if the primary standard has been laid down. If the codes do not meet with the state's approval, the state may repeal the law and the codes fall with it. Nothing could be more obvious than that *the filling in of details* must of natural necessity be subsequent to the primary standard law, which provides that the violation of the filled in details of the primary standard shall constitute an offense.

The incidental objection that the delegation of code prescription to the President of the United States on the ground that the state of California is a sovereign state and the President is in this sense a foreign official does not greatly impress us. The correlative rights of state and nation are of great importance, but we are a nation not an alliance of foreign states, and our President is not a foreign potentate.

That the incidental powers may be delegated to a body or be measured by a standard not under the control of the state and that they may be subject to change are all well illustrated by *Ex parte Gerino, supra.*

If ever there could occur a state of facts justifying, even demanding, co-operative effort between the state and the nation, as provided for in the law under consideration here, we have it in the principle underlying this case. The disease is but one and the patient is but one; how logical that the

curative agents must not conflict. A code regulated business entering interstate commerce would be, in a large measure, ineffective if it came in competition with the same sort of business that was unregulated when entering intrastate commerce. Only confusion could result if one code were fixed for produce entering interstate commerce and another code for produce entering intrastate commerce.

It is not here claimed that the code regulations, which petitioner stands accused of violating, are not proper regulations if the general principles of the act herein discussed are held to be within the constitutional requirements.

We conclude that no constitutional right of petitioner has been infringed and that the writ should be discharged and the petitioner remanded and it is so ordered.

Desmond, J., and Scott, J., *pro tem.*, concurred.