# Constitutionality of Legislation to Establish a Program to Prevent Aircraft Piracy

Congress may establish jurisdiction in United States courts over individuals who commit the offense of hijacking outside the territorial jurisdiction of the United States.

In most cases, state and local law enforcement officers would be authorized to make arrests for violations of the proposed aircraft piracy legislation, either because hijacking airplanes would also violate state law, or because federal law permits federal enforcement officers to delegate arrest authority to state and local law enforcement officers and state law permits state and local law enforcement officers to accept delegated arrest authority.

March 23, 1973

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

This is in response to your request for the views of the Office of Legal Counsel on questions concerning the constitutionality and legality of certain provisions in proposed legislation (S. 39 and H.R. 3858, 93d Cong.) that would establish a program to prevent aircraft piracy. The questions, which were raised during the course of hearings before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, are the following:

## I. Federal Jurisdiction

Whether Congress has the power to establish federal jurisdiction over individuals who commit the offense of hijacking outside the territorial jurisdiction of the United States in the event that the government does not choose to extradite the individual?

## II. Arrest Authority of Local Law Enforcement Officers and Private Security Personnel

A. Whether local law enforcement officers are authorized to arrest for violations of federal law?

B. Whether the United States may delegate arrest authority to local law enforcement officers or private security personnel?

C. Whether private security personnel are authorized to arrest for violations of federal or local laws?

D. Whether the United States can deputize private personnel as Deputy United States Marshals?

The constitutional aspects and any relevant statutory authority on these questions will be discussed *seriatim*.

## I. Constitutionality of Establishing Jurisdiction Over Individuals Who Commit the Offense of Hijacking Outside the Territorial Jurisdiction of the United States

Any determination of the constitutional dimensions of establishing "extraterritorial jurisdiction"—that is, the assertion of jurisdiction over individuals who engage in conduct outside the territorial limits of the United States that violates federal criminal law and therefore subjects the individual to prosecution in domestic federal courts—must begin with a discussion of the nature of criminal jurisdiction under international law. In general, there are five basic principles of international jurisdiction:

> first, the territorial principle, determining jurisdiction by reference to the place where the offense is committed; second, the nationality principle, determining jurisdiction by reference to the nationality or national character of the person committing the offence; third, the protective principle, determining jurisdiction by reference to the national interest injured by the offence; fourth, the universality principle, determining jurisdiction by reference to the custody of the person committing the offence; and fifth, the passive personality principle, determining jurisdiction by reference to the nationality or national character of the person injured by the offence.

*Codification of International Law, Part II: Jurisdiction with Respect to Crime*, 29 Am. J. Int'l L. Supp. 435, 445 (1935) (Research in International Law, Harvard Law School).

Of these five principles, the territorial basis is the most common. It has often found expression in our case law. One of the first statements of this principle was made in *The Appollon*, in which the Supreme Court spoke in sweeping terms: "The laws of no nation can justly extend beyond its own territories, except so far as it regards its own citizens." 22 U.S. (9 Wheat.) 362, 370 (1824). The Court did not associate this general rule with any provision in the Constitution. The context in which the Court spoke, however, demonstrated that it recognized that the purpose of the general rule was also the touchstone for its limitation: "[The laws of a nation] can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction." *Id*. The underpinning of the territorial concept is that a government, in order to maintain its sovereignty indivisible, must be the only power capable of enforcing peace and order within its own boundaries. Accordingly, "no other nation can enact extraterritorial legislation which would interfere with the operation of such laws." *United States v. Rodriguez*, 182 F. Supp. 479, 488 (S.D. Cal. 1960), *aff'd in part, rev'd in part on other grounds*, *Rocha v. United States*, 288 F.2d 545 (9th Cir. 1961).

The assertion of extraterritorial jurisdiction over aircraft hijackers present within the territorial boundaries of the United States does not contravene this principle. Article 4.2 of the Multilateral Hijacking Convention—approved by a 77-nation diplomatic conference, including the United States, held at The Hague, December 1–16, 1970, and signed by 48 other countries on December 16, 1970—provides that:

> Each Contracting State shall . . . take such measures as may be necessary to establish its jurisdiction over the offence in the case where the alleged offender is present in its territory and it does not extradite him pursuant to article 8 to any of the states mentioned in paragraph 1 of this article.

Convention for the Suppression of Unlawful Seizure of Aircraft, *opened for signature* Dec. 16, 1970, 860 U.N.T.S. 105, 108 (entered into force Oct. 14, 1971).[1] Thus, by the express terms of the Convention the signatory countries countenance the assertion of jurisdiction by one nation over aircraft hijackers who commit in or against another nation the offense of hijacking and related offenses as defined in article 1 of the Convention. The enactment of legislation establishing extraterritorial jurisdiction over aircraft hijackers does not, therefore, offend the dignity or right of sovereignty of the contracting nations or interfere with their laws or rights, the consequences with which the Supreme Court was concerned in *The Appollon* and the principle which the World Court recognizes as "the first and foremost restriction imposed by international law upon a State." *The S.S. Lotus* (Fr./Turk.), Judgment No. 9, 1927 P.C.I.J. (ser. A) No. 10, at 18 (Sept. 7).[2]

---

[1] Paragraph 1 of Article 4 requires each Contracting State to establish jurisdiction in the following cases:

> (a) when the offense is committed on board an aircraft registered in that State;
>
> (b) when the aircraft on board which the offense is committed lands in its territory with the alleged offender still on board;
>
> (c) when the offence is committed on board an aircraft leased without crew to a lessee who has his principal place of business or, if the lessee has no such place of business, his permanent residence, in that State.

860 U.N.T.S. at 108.

[2] In *The S.S. Lotus*, the World Court drew a distinction between the assertion of jurisdiction over those found within the boundaries of a nation but who committed the offense outside the territorial limits of the nation and the enactment of laws seeking to control physically the actions of those in some sovereign state:

> Now the first and foremost restriction imposed by international law upon a State is that—failing the existence of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State. In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or from a convention.

Where the assertion of jurisdiction does not conflict with this principle, a sovereign nation may select a different jurisdictional basis from the jurisprudence of international law. Likewise, as the court stated in *Rodriguez*, possessing the power under the Constitution, "[f]rom the body of international law, the Congress may pick and choose whatever recognized principle of international jurisdiction is necessary to accomplish the purpose sought by the legislation." 182 F. Supp. at 491. In this instance, the jurisdictional principle that is apposite and is in fact reflected in the Multilateral Hijacking Convention is the universality principle under which a state establishes jurisdiction "by reference to the custody of the person committing the offense." *Jurisdiction With Respect to Crime*, 29 Am. J. Int'l L. Supp. at 445. Accordingly, because universal jurisdiction exists as a recognized doctrine of international law, it constitutes a jurisdictional basis that Congress can rightfully incorporate into its legislation. *See Rodriguez*, 182 F. Supp. at 491; *see also Blackmer v. United States*, 284 U.S. 421, 436–38 (1932) (nationality principle, i.e., the assertion of jurisdiction on the basis of the nationality of the actor, chosen as the jurisdictional basis to prosecute the offense of contempt against an American citizen who refused to return from France to testify when ordered to do so). As the Supreme Court declared in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936), "as a member of the family of nations, the right and power of the United States are equal to the right and power of the other members of the international family."

Having concluded that universal jurisdiction constitutes a basis for jurisdiction under international law, the question remains whether Congress possesses the power under constitutional law to enact legislation establishing jurisdiction over aircraft hijackers who commit an offense outside the territorial limits of the United States. We perceive two sources of power authorizing the assertion of this

---

It does not, however, follow that international law prohibits a State from exercising jurisdiction in its own territory, in respect of any case which relates to acts which have taken place abroad, and in which it cannot rely on some permissive rule of international law. . . . Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property and acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rule; as regards other cases, every state remains free to adopt the principles which it regards as best and most suitable.

. . . .

In these circumstances, all that can be required of a state is that it should not overstep the limits which international law places upon its jurisdiction; within these limits, its title to exercise jurisdiction rests in its sovereignty.

. . . .

. . . The territoriality of criminal law, therefore, is not an absolute principle of international law and by no means coincides with territorial sovereignty.

*Id.* at 18–20.

extraterritorial jurisdiction: the power to define and punish piracies and offenses against the law of nations (U.S. Const. art. I, § 8, cl. 10), and the power to make all laws necessary and proper to implement the power to make treaties (*id.* art. I, § 8, cl. 18; *id.* art. II, § 2, cl. 2).

Article I, Section 8, Clause 10 of the Constitution provides that "[t]he Congress shall have Power . . . [t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." Piracies and offenses against the law of nations are international crimes which every nation has a duty to prevent. 1 L. Oppenheim, *International Law: A Treatise* § 151, at 246 (Ronald F. Roxburgh ed., 3d ed. 1920) ("Oppenheim"). In *United States v. Arjona*, the Supreme Court, in upholding under the Define and Punish Clause the constitutionality of a federal statute preventing and punishing counterfeiting within the United States the money of foreign governments, described the nature of the international obligation to enforce laws that define offenses against the law of nations:

> A right secured by the law of nations to a nation, or its people, is one the United States, as the representatives of this nation, are bound to protect. Consequently, a law which is necessary and proper to afford this protection is one that Congress may enact, because it is one that is needed to carry into execution a power by the Constitution on the Government of the United States exclusively . . . . Therefore, the United States must have the power to pass it and enforce it themselves, or be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations.

120 U.S. 479, 487 (1887). And in *Ex Parte Quirin*, the Supreme Court found that the power to define and punish offenses against the law of nations granted to Congress the authority to establish the jurisdiction of military tribunals to try offenders or offenses against the law of war:

> Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.

317 U.S. 1, 28 (1942).

Piracy is the best known example of a crime against the law of nations. The jurisdiction to arrest and punish has been regarded as universal, that is, even though the offense of piracy may be committed outside the territorial jurisdiction

of any nation, the offender may be subjected to the municipal jurisdiction of any nation. 1 Oppenheim § 151, at 246.

What constitutes piracy has been a matter of uncertainty in international jurisprudence and consequently in United States municipal law, which explicitly relies on the "law of nations." *See Codification of International Law, Part IV: Piracy*, 26 Am. J. Int'l L. Supp. 739, 749, 768–822 (1932) (Research in International Law, Harvard Law School). The United States Senate, on May 26, 1990, ratified the Convention on the High Seas adopted by the United Nations Conference on the Law of the Sea, which provides that acts of piracy can be committed against ships or "aircraft" if the offense takes place on the high seas or outside the jurisdiction of any state. 106 Cong. Rec. 11,178, 11,192; Convention on the High Seas art. 15, *opened for signature* Apr. 29, 1958, 13 U.S.T. 2312, 2317, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962). To the extent that the word "piracy" in Article I, Section 8, Clause 10 of the Constitution refers only to the traditional concept of piracy—i.e., the overtaking of ships on the high seas and outside the jurisdiction of any nation—the Define and Punish Clause would not afford a basis for legislation establishing *universal* jurisdiction over the offense of *aircraft* hijacking. However, this offense now constitutes "an offense against the law of nations." The Supreme Court in *Arjona* described "an offense against the law of nations as one which the United States are required by their international obligations to use due diligence to prevent." 120 U.S. at 488. By the Multilateral Hijacking Convention, the United States in article 2 undertook the obligation to punish aircraft hijacking and related offenses as defined in article 1. Thus, these offenses now constitute crimes under international law and, accordingly, fall within the power of Congress to define and punish as offenses against the law of nations.

Congress is also empowered to enact a provision establishing jurisdiction to implement article 4.2 of the Multilateral Hijacking Convention as legislation which is necessary and proper for carrying into execution the treaty making power of the United States. In *Neely v. Henkel*, the Supreme Court, in upholding the constitutionality of legislation securing the return to Cuba, to be tried by its constituted authorities, of those who committed crimes within Cuba but escaped to the United States, stated this constitutional principle:

> The power of Congress to make all laws necessary and proper for carrying into execution as well the powers enumerated in Section 8 of article I of the Constitution as all others vested in the government of the United States, or in any department or the officers thereof, includes the power to enact such legislation as is appropriate to give efficacy to any stipulations which it is competent for the President by and with the advice and consent of the Senate to insert in a treaty with a foreign power.

180 U.S. 109, 121 (1901).

In *Stutz v. Bureau of Narcotics*, the court found the Opium Control Act of 1942 constitutional because the Act was necessary and proper to carry into execution the treaty resulting from the International Opium Convention of 1912:

> The power of Congress to enact such legislation as is necessary or proper to carry into execution powers vested by the Constitution in the United States, of which the treaty making power is one, includes the right to employ any legislative measures appropriately adapted to the effective exercise of those powers. *Julliard v. Greenman*, 110 U.S. 421 (1884). So long as a rationally sound basis exists for the congressional determination that particular legislation is appropriately related to the discharge of constitutional powers, the validity of such legislation is unassailable.

56 F. Supp. 810, 813 (N.D. Cal. 1944).

Thus, if the United States is empowered to enter into treaty stipulations with foreign powers designed to protect aircraft from unlawful seizure and if the establishment of extraterritorial jurisdiction is a legislative measure appropriately adapted to implement the ends sought in the Multilateral Hijacking Convention, the legislation is constitutional. In our view, both of these predicates are established. We believe that it is clear that the federal government had the authority under the treaty-making power (U.S. Const. art. II, § 2, cl. 2) to enter into the treaty stipulations found in the Convention. While the Supreme Court has never declared a treaty or any provision in it unconstitutional, the Court has stated that the treaty power is not unlimited, *DeGeofrey v. Riggs*, 133 U.S. 258 (1890), although it has not attempted to fix any hard or fast limits to that power. The Court has stated, however, that the test of the treaty power of the government is different from that of the power of Congress to enact domestic legislation: "It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could . . . ." *Missouri v. Holland*, 252 U.S. 416, 433 (1920).

Here the subject of the Multilateral Hijacking Convention—the regulation and protection of foreign commerce—is clearly a matter within the scope of the treaty-making power. As the Supreme Court said in *Arjona*, sovereigns are obliged to protect commerce. 120 U.S. at 484. In this instance, an interest of international magnitude and ramifications is involved—the security of aircraft, passengers and cargo. It can be protected only by the action of one sovereign conducted in concert with that of another. *Cf. Missouri v. Holland*, 252 U.S. 416 (1920). And the means chosen in article 4.2—the assertion of universal jurisdiction over an offender whom the contracting nation does not choose to extradite—does not, in our view, contravene any prohibitory words to be found in the Constitution. Likewise, we believe that it is evident that the legislation implementing article 4.2 is a legitimate

means to accomplish this end and therefore is "appropriately related to the discharge of constitutional powers." *Stutz*, 56 F. Supp. at 813.

## II. Arrest Authority of Local Law Enforcement Officers and Private Security Personnel

### A. Authority of Local Law Enforcement Officers to Arrest for Violations of Federal Law

At the threshold it is necessary to point out that the question whether a state law enforcement officer has the authority to arrest does not arise where the offender commits an offense that violates state law as well as federal law. For example, the single act of robbery of a state bank whose funds are insured by the Federal Deposit Insurance Corporation constitutes an offense under both state law and the Federal Bank Robbery Statute, 18 U.S.C. § 2113. Because the act violates state law, the state officer is clearly authorized to arrest the offender and subsequently turn him over to federal officials for prosecution under federal law. It is our understanding that in situations involving the offense of hijacking and related offenses, the hijacker often commits offenses which are proscribed under both federal and state law. Thus, there is no question as to the state officer's power to arrest in such situations. The question arises then only in relatively rare instances where the offense is one proscribed under federal law but not under state law.

### 1. Arrest With a Warrant

Section 3041 of title 18, U.S. Code, provides that:

> For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, major of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested . . . .
>
> . . . Any state judge or magistrate acting hereunder may proceed according to the usual mode of procedure of his state but his acts and orders shall have no effect beyond determining to hold the prisoner for trial or to discharge him from arrest.

The source of this provision is a statute enacted by the first Congress in 1789 (Act of Sept. 24, 1789, ch. 20, § 33, 1 Stat. 91), and it has consistently been interpreted as conferring on state law enforcement officers the authority to arrest when acting pursuant to an arrest warrant. *Harris v. Super. Ct. of Sacramento Cnty.*, 196 P. 895

(Cal. App. 1921); *Goulis v. Stone*, 140 N.E. 294 (Mass. 1923); *Lensku v. O'Brien*, 232 S.W. 235 (Mo. App. 1921).

## 2. Arrest Without a Warrant

No act of Congress authorizes state officers to arrest for federal offenses when they act without an arrest warrant. However, a number of federal courts have recognized the authority of state officers to arrest those who violate federal laws when state law confers such authority on state law enforcement officers. In *Marsh v. United States*, the Second Circuit held that a New York State trooper had the authority to arrest the defendant without a warrant for a federal offense committed in his presence by virtue of the New York arrest statute which empowered state peace officers to arrest without a warrant a person committing a crime in their presence. 29 F.2d 172 (1928). The court noted that peace officers in New York customarily arrested for federal offenses and considered this practice as evidence of the meaning of the state arrest law:

> Section 2 of article 6 of the Constitution makes all laws of the United States the supreme law of the land, and the National Prohibition Law is as valid a command within the borders of New York as one of its own statutes. True, the state may not have, and has not, passed any legislation in aid of the Eighteenth Amendment, but from that we do not infer that general words used in her statutes must be interpreted as excepting crimes which are equally crimes, though not forbidden by her express will. We are to assume that she is concerned with the apprehension of offenders against laws of the United States, valid within her borders, though they cannot be prosecuted in her own courts.

*Id.* at 174. In *United States v. Di Re*, the Supreme Court assumed that a state officer may arrest without a warrant for a federal offense when so authorized by state law in ruling that when a state law enforcement officer makes such an arrest, the law of the state "provides the standard by which [the] arrest must stand or fall" where Congress has not enacted a federal rule governing the arrest. 332 U.S. 581, 591 (1948). *See also Miller v. United States*, 357 U.S. 301, 305 (1958). Thus, state law determines whether the law enforcement officers of that state may arrest federal offenders without an arrest warrant.

A survey of United States Attorneys by the General Crimes Section of the Criminal Division indicates that only eleven states have no laws conferring on their law enforcement officers the authority to arrest for federal offenses without a

warrant.[3] In these eleven states, however, the United States Attorneys indicate that in most situations state offenses are committed which thereby empower the officer to arrest the offender.

### B. Authority of the Federal Government Under Existing Federal Law to Delegate Arrest Authority to Local Law Enforcement Officers or Private Security Personnel

### 1. Delegation to Local Law Enforcement Officers

The federal government has "from the time of its establishment . . . been in the habit of using, with the consent of the States, their officers, tribunals, and institutions as its agents" to accomplish national goals. *United States v. Jones*, 109 U.S. 513, 519 (1883). The contention that the United States as a government sui generis cannot delegate authority to state officials because they operate under a different government has always been rejected on the ground that our system is one of federalism and not an alliance of foreign states. *Id.*; *Ex parte Laswell*, 36 P.2d 678, 687 (Cal. App. 1934). In *Arver v. United States*, the Supreme Court, in upholding the placement of administrative authority in the hands of state officials under the Selective Service draft statutes of World War I, overruled the objection that this constituted an invalid delegation of federal legislative power to state officials saying that it was "too wanting in merit to require further notice." 245 U.S. 366, 389 (1918). *See also Dallemagne v. Moisan*, 197 U. S. 169 (1905) (local police officer empowered to arrest crew-member of foreign vessel, under federal treaty authorization); *Robertson v. Baldwin*, 165 U.S. 275 (1897) (arrests of deserting seaman by local justices of the peace).

Having the power to enact a federal law proscribing certain conduct, Congress can under the Supremacy Clause impose upon state law enforcement officials the authority and duty to enforce the federal law. In *Testa v. Katt*, the Supreme Court held that, by virtue of the Supremacy Clause, a state court was not free to refuse to hear a federal cause of action. 330 U.S. 386 (1947). There a suit under the Emergency Price Control Act, which established concurrent jurisdiction in the state and federal courts, was brought in state court but was dismissed by the state supreme court on the ground that a state need not enforce the penal laws of a government which is foreign to it. The Supreme Court reversed and declared that a state does not have a right to deny enforcement to claims arising out of a valid federal statute. In effect, a state official, a judge, was compelled to enforce federal law.

---

[3] Those states are Connecticut, Hawaii, Illinois, Indiana, Maine, Massachusetts, Missouri, Montana, Nevada, North Carolina, and Vermont. Of the 39 states conferring such authority on their law enforcement officers, eight do not empower the officers to arrest for misdemeanors not committed within the officers' presence.

In *Henderson v. United States*, the Court of Appeals for the Fifth Circuit applied the *Testa* rationale to the question of delegation of arrest authority by the federal government to state officials:

> It was at an early date questioned whether Congress could constitutionally impose upon state officers the power and duty to enforce federal criminal law . . . ; but that issue has now been settled in the affirmative upon the basis of the supremacy clause and of "the fact that the States of the Union constitute a nation."

237 F.2d 169, 175–76 (5th Cir. 1956) (quoting *Testa*, 330 U.S. at 389). "There [in *Testa*] the Court definitely 'repudiated the assumption that federal laws can be considered by the states as though they were laws emanating from a foreign sovereign.'" *Id.* at 176 (quoting *Testa*, 330 U.S. at 390–91). Accordingly, Congress can authorize state law enforcement officers to arrest for federal offenses in order to assist the federal government in accomplishing the goals of an anti-hijack program. Likewise, where authorized by Congress, an executive department can delegate the authority to arrest to state or local law enforcement officers. For example, a United States Marshal is authorized to appoint state officials as Deputy United States Marshals thereby conferring on them the authority to arrest for federal crimes. *See infra* Part II.D.

## 2. Delegation to Private Security Personnel

In 1934, it was said that "[t]here is considerable confusion and uncertainty as to what powers may be delegated by the legislature to private individuals, corporations, and associations, and how far the operation of a statute may be made to depend upon the action of such private person." Annotation, *Possible Limits of Delegation of Legislative Power*, 79 L. Ed. 474, 495 (1934). The confusion and uncertainty remains as to this day. *See* Louis L. Jaffe & Nathaniel L. Nathanson, *Administrative Law: Cases and Materials* 78–81 (3d ed. 1968).

In *St. Louis, I.M. & S.R. Co. v. Taylor*, the Supreme Court held that a provision of the Federal Safety Appliance Act authorizing the American Railway Association to designate to the Interstate Commerce Commission the standard height of drawbars for railroad cars did not involve an unconstitutional delegation of power to the Railway Association. 210 U.S. 281 (1908). On the other hand, in *Carter v. Carter Coal Co.*, the Court held unconstitutional a delegation to private parties. There the Court invalidated the Bituminous Coal Conservation Act of 1935 which required all Code members to observe maximum hours agreed to in contracts negotiated between producers of two-thirds of the annual national tonnage and representatives of more than one-half of the employed mine workers. 298 U.S. 238 (1936). The Court found that this delegation violated the Due Process Clause of the Fifth Amendment:

> The power conferred on the majority is in effect the power to regu-
> late the affairs of an unwilling minority. This is legislative delegation
> in it most obnoxious form; for it is not even delegation to an official
> or an official body, presumptively disinterested, but to private per-
> sons whose interests may be and often are adverse to the interests of
> others on the same business.

*Id.* at 311. In a subsequent case, *Old Dearborn Co. v. Seagram Corp.*, Mr. Justice
Sutherland, the author of the opinion in *Carter Coal*, speaking for the Court, said:

> We find nothing in [the application of the so-called non-signer provi-
> sions of the Fair Trade Acts making it unlawful for any person to sell
> a commodity at a lower price than that stipulated in a contract be-
> tween third parties] to justify the contention that there is an unlawful
> delegation of power to private persons to control the disposition of
> the property of others . . . .

299 U.S. 183, 194 (1934). The Court distinguished *Carter Coal* on the ground that
there the property affected had been acquired without any preexisting restriction
whereas, in *Old Dearborn*, "the restriction, already imposed with the knowledge
of appellants, ran with the acquisition and conditioned it." *Id.*

All of the above cases dealt with the delegation of legislative power. Here
however we are concerned with the authorization of certain private individuals to
exercise an executive power—the arrest power—over other individuals. Private
individuals have long been used as instrumentalities of the government. *See
Wilson v. Black-Bird Creek Marsh Co.*, 27 U.S. (2 Pet.) 245 (1829) (a measure
benefitting the public held valid although it was to be made effective through the
instrumentality of a private company). Section 507 of title 19, U.S. Code, author-
izes a customs officer "to demand of any person . . . to assist him in making any
arrests, search or seizure authorized by [title 19, Customs Duties]." Private
individuals also have been authorized to arrest and carry firearms when specifical-
ly deputized as Deputy United States Marshals. 18 U.S.C. § 3053. *See infra* Part
II.D.

It is arguable that, so long as adequate standards are established to govern the
conduct of the private individuals, Congress can constitutionally authorize private
individuals to exercise the arrest power. However, such a step will inexorably
present problems in defining the category of private individuals who are or should
be accorded the arrest authority, delineating the territorial limits of the authority
accorded and determining which, if any, of the immunities, rights, and duties of
federal law enforcement officers are applicable to the private individuals. The
standards for the arrest and the law enforcement powers, such as the power to
search and seize, that are concomitant to the power to arrest also present problems
of definition. Concerns such as these and more generally the concern over the

exercise of power left in the hands of unofficial persons who owe no allegiance to the government other than as citizens, may well have led to the enactment in 1893 of the Act of March 3, 1893, ch. 208, 27 Stat. 572, 591 (now codified as amended at 5 U.S.C. § 3108), which prohibits the employment by the federal government of any individual employed by the Pinkerton Detective Agency or similar organization.

To our knowledge there are presently no federal statutes, other than 19 U.S.C. § 507 and 18 U.S.C. § 3053 referred to above, authorizing private individuals to arrest or to assist in the arrest for federal crimes. Thus, the power of private security personnel to arrest for federal offenses depends on whether state law accords them this power, *see infra* Part II.C, or on whether they have been "delegated" the arrest power from a body that possesses that power, e.g., the United States Marshals Service, which "delegates" the arrest power by deputization, *see infra* Part II.D.

### C. Existing Authority of Private Security Personnel to Arrest for Violation of Federal or Local Laws

The answer to this question, like the answer to the question concerning the authority of local law enforcement officers to arrest for federal offenses without a warrant, *see supra* Part II.A.2, must be found in state law. We have not attempted a comprehensive survey of state law in this respect. It is our understanding, however, that there is no general rule. While some states limit the authority to carry firearms and/or to arrest to law enforcement officers, others authorize private detectives or security guards to arrest and carry arms.

### D. Authority of the Federal Government to Deputize Private Security Personnel as Deputy United States Marshals

Section 562 of title 28, U.S. Code, provides that the Attorney General may authorize a United States Marshal to appoint deputies. Pursuant to 28 U.S.C. § 510, the Attorney General has delegated this function to the Director, United States Marshals Service, 28 C.F.R. § 0.17, who in turn has authorized United States marshals, upon the approval of the Office of the Director or in acute emergency situations, independently, to deputize federal employees and other persons as Deputy United States Marshals. United States Marshals Manual § 130.01.

A marshal may deputize a private citizen to assist him in the performance of his official duties. *Jewett v. Garrett*, 47 F. 625 (C.C. N.J. 1891); *cf. Murray v. Pfeiffer*, 59 A. 147 (N.J. Err. & App. 1904). In specific instances, 5 U.S.C. § 3108 may prohibit the deputization of an individual employed by the Pinkerton Detective Agency or similar organization. Moreover, although the authority to deputize

private individuals on an emergency basis is clear, long-term deputizations may be questionable. *See* United States Marshals Manual § 130.01.

ROBERT G. DIXON, JR.
*Assistant Attorney General*
*Office of Legal Counsel*